NEASE v. COAL & COKE RY. CO. et al.

(District Court, N. D. West Virginia. April 23, 1912.)

1. VENDOR AND PURCHASER (§ 239*)—BONA FIDE PURCHASERS—CONSTRUCTIVE NOTICE—RECORDING OF INSTRUMENTS.

Where a contract creating rights in certain real estate was properly acknowledged and duly recorded in the counties in which the real estate was located, subsequent purchasers under the law of West Virginia took with notice of the entire contract.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 583–600; Dec. Dig. § 239.*]

2. CONTRACTS (§ 147*)—CONSTRUCTION—INTENTION OF PARTIES.

The court in construing a contract must give effect to the intention of the parties as ascertained from a consideration of the entire contract, together with the circumstances under which it was made, the subject-matter, and the relation of the parties.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 730, 743; Dec. Dig. § 147.*]

3. EVIDENCE (§ 461*)—PAROL EVIDENCE—ADMISSIBILITY.

Where a contract is ambiguous, parol evidence of the circumstances under which it was made, the subject-matter, and the relation of the parties is admissible to aid the court in ascertaining the intent of the parties.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2129-2133; Dec. Dig. § 461.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

4. MINES AND MINERALS (§ 55*)—CONTRACTS—CONSTRUCTION—RIGHTS ACQUIRED.

The majority stockholders of a railroad corporation desiring to secure for it funds to extend its line contracted with complainant for the organization of a corporation for the purchase of coal lands, subject to prescribed rights of the parties. Options on coal lands were secured, and complainant made payments therefor. A compromise agreement between the parties provided that the coal rights should be held in trust for the parties; that the majority stockholders should organize a corporation to which the trustee should convey the rights on the corporation binding itself to pay the unpaid price and to pay to complainant royalties on coal mined. The contract required the majority stockholders to make immediate and diligent efforts to finance the corporation and cause the construction of a railroad to the coal fields, and, in case they failed to do so on or before a designated future date, complainant should have, in lieu of royalties, an undivided interest in the coal property, and the majority stockholders, the remainder. *Held,* that the contract required the majority stockholders to provide means to build the railroad and pay for the coal before the designated date, and that mining operations should commence within a reasonable time, and, in the event that that was not done, complainant acquired the specified undivided interest in the coal property.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 153–165; Dec. Dig. § 55.*]

5. VENDOR AND PURCHASER (§ 239*)—BONA FIDE PURCHASER—RIGHTS ACQUIRED.

A purchaser with notice of another's rights cannot secure any greater interest as against such other than that vested in his vendor, and, where the vendor's right is incumbered with fixed obligations to be performed in the future, the purchaser takes subject thereto.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 583–600; Dec. Dig. § 239.*]

6. EQUITY (§ 71*)—LACHES.

Where vested interests in real estate are secured by executory contracts, duly acknowledged and recorded, the defense of laches in asserting and maturing such interest into perfect legal title is not applicable, but such interests may be lost by adverse possession under hostile title for the statutory period.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 204–211; Dec. Dig. § 71.*]

7. EQUITY (§ 84*)—LACHES.

Defendant who holds in privity of title with plaintiff may not plead laches of the latter in asserting and taking possession of his interest, which defendant claims to have acquired, but in such case defendant will be held to be a trustee for plaintiff.

[Ed. Note.—For other cases, see Equity, Dec. Dig. § 84.*]

8. MINES AND MINERALS (§ 48*)—MINERALS IN GROUND—NATURE OF PROPERTY.

Coal in place in the ground is real estate in West Virginia, and a contract which gives to one an undivided interest in coal property, in the event of a failure of the adverse party to begin mining operations within a reasonable time, creates an interest in real estate.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 134; Dec. Dig. § 48.*]

9. MINES AND MINERALS (§ 54*)—CONTRACTS—RIGHTS ACQUIRED.

Where a contract, duly acknowledged and recorded, gave to plaintiff, a party thereto, royalties on coal mined on described lands, or an undivided interest in the lands in the event of the failure to begin mining operations within a specified time, and the corporation organized to perform the obligations of the contract, acquired the lands and con-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

veyed to a third person who ignored the rights of the party, the purchaser must be deemed to have elected to assume the obligations of the corporation to carry out the contract to mine coal within a reasonable time and pay a royalty thereon, or to concede to plaintiff an undivided interest to the coal as real estate, and plaintiff's rights could not be defeated by laches.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 149–152; Dec. Dig. § 54.*]

**10.** MINES AND MINERALS (§ 54*)—CONTRACTS—RIGHTS ACQUIRED—ESTOPPEL.
The right of a party to a contract stipulating that he should have royalties on coal mined in described land or an undivided interest in the land in the event of a failure to mine coal within a reasonable time may not be destroyed by his instituting and dismissing a suit on the contract, where no defense was made nor right adjudicated.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 149–152; Dec. Dig. § 54.*]

**11.** MINES AND MINERALS (§ 54*)—CONTRACTS—RIGHTS ACQUIRED—ESTOPPEL.
A contract between parties who had acquired options on coal lands provided that the coal rights should be held by a trustee for the parties, each of whom should contribute equally the necessary funds to pay for the rights, that the trustee should convey the rights to the corporation on it agreeing to pay the unpaid price, and to refund the money paid by the parties in securing the rights. The options were conveyed to a corporation organized to perform the contract, and it made a refund to one of the parties who executed a receipt therefor with the understanding that it was in accord with the conditions of the contract. *Held*, that the party was not estopped by the receipt from insisting on his rights under the contract.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 149–152; Dec. Dig. § 54.*]

**12.** MINES AND MINERALS (§ 54*)—CONTRACTS—PERFORMANCE.
Where a contract provided that a party thereto should receive royalties on coal mined in described land or an undivided interest in the land, in the event of a failure to mine coal within a reasonable time, and nine years elapsed without the commencement of mining operation, the party was entitled to insist on his undivided interest in the land acquired, but he must be charged with the payment of his part of the price of the land.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 149–152; Dec. Dig. § 54.*]

In Equity. Suit by David A. Nease against the Coal & Coke Railway Company and others. Decree for complainant.

On the 25th day of November, 1899, Henry C. Jackson, Albert B. White, and V. B. Archer were the owners of a majority of the stock of the Little Kanawha Railroad Company. It was desired by them to obtain a loan whereby this road could be extended, and its outstanding obligations could be liquidated. As a basis for such loan, they desired to obtain certain coal interests along the road's proposed extension, in Gilmer, Lewis, and Braxton counties, W. Va. Plaintiff desired to finance the construction of the road, secure for it a loan, and obtain an interest in the coal field. Thereupon, on that day, a contract was entered into between Jackson, White, and Archer of the first and Nease of the second part, whereby a coal company was to be organized by the parties for the purchase of coal and coal lands, the taking over of coal options already acquired by Jackson et al., which coal interests were to be used specifically to guarantee the railroad's bonds, no matter by which party the funds to build with were secured.

All coal rights secured were to be held jointly, each party to have a half interest, and each side was to contribute $5,000 with which to secure them.

Not less than 15,000 and 25,000 acres, if possible, were to be optioned. So soon as money was secured, as contemplated, to purchase these coal rights, these $5,000 advances were to be repaid. The rights transferred to the coal company and the interests of the parties were to be 30 per cent. of profits to Jackson and White; the residue, 70 per cent., to Nease. Nease was to continue negotiations for a $600,000 loan to be used to discharge the outstanding liabilities of the railroad and in extending it. This loan was to be secured by first mortgage of the railroad upon terms and conditions immaterial to the issue here. If Nease secured this loan, his interest in any profits arising therefrom was to be 60 per cent., and those arising from the coal interests 70 per cent. If, however, Jackson, White, and Archer of themselves secured the means necessary to extend the road and purchase the coal lands, then Nease was to have no share in the profits of construction of the railroad and only 25 per cent. of the coal obtained. Other provisions are incorporated in this contract immaterial to this controversy. The last clause provided that this contract should cease and terminate, if not consummated on February 1, 1900, except as to the interest in the coal options which were to be held as provided for in the contract, claimed by Nease to be an undivided half interest to each. This contract expired by limitation. With sums advanced by the parties, coal options had been obtained to the extent of about 25,000 acres. These options had been taken in the name of George Gillmor, trustee. A controversy arose between the parties. Jackson and his associates claimed Nease had prevented them from negotiating, on their own account, the financial arrangements, by reason of his statements to the parties with whom they were negotiating. Thereupon, in April, 1900, they brought suit in equity in the circuit court of Gilmer county against Nease and Gillmor, trustee, for the purpose of having the interest of Nease in the coal options placed in the hands of a receiver and sold under decree. In this bill they denied Nease had a half interest, but, on the contrary, insisted it was a much smaller one. A receiver was appointed and a decree of sale entered. At this juncture Nease appeared, filed his answer, and, upon hearing, secured the setting aside of the decree of sale and the discharge of the receiver. H. C. Jackson had also instituted an action at law for damages against Nease. In this condition of things, a compromise was effected and a new contract was entered into. This contract was between Nease, P. G. Kelsey, and George G. Hadley of the first part, H. C. Jackson, A. B. White, Dennis O'Brien, G. A. Newlon, and W. W. Jackson of the second part, George Gillmor, trustee, of the third part, and V. B. Archer of the fourth part. This contract is dated May 5, 1900. Nease had sold parts of his interests to Kelsey and Hadley. He claims now to have repurchased from them such interests.

By this second contract, all pending suits between parties were to be dismissed "agreed," all disagreements settled, and all prior agreements set aside. The coal options and rights were to be held in trust by Gillmor as trustee, and conveyed to a corporation to be organized by H. C. Jackson, White, O'Brien, Newlon, and W. W. Jackson, parties of the second part, upon their request. Before conveying, however, Gillmor was to require from the corporation a duly executed and acknowledged agreement, whereby it should undertake to pay all purchase money unpaid under the options, not to lease the coal or any part thereof and "to pay to the parties of the first part (Nease, Kelsey, and Hadley), their heirs or assigns, a royalty on all coal mined (including that consumed on the premises or converted into coke) from lands covered by said coal rights or options, which royalty shall be fixed in said agreement at one-fifth (1/5) of the amount of the average prevailing royalty paid on coal of like character and mined under similar conditions in the vicinity or region (including the Monongah and Fairmont coal fields) where, and at the time when, such coal is actually mined. * * * Said royalty shall be payable monthly." The agreement was further to bind the corporation to mine no other coal than the 25,000 acres covered by the options so long as it lasted, and to give a representative of Nease and associates free access to the coal lands and rights and to the corporation's books of accounts and shipments.

This contract further provided: That its parties of the first part (Nease et al.) and of the second part (Jackson et al.) should pay equally sums to Gillmor, trustee, necessary to pay for the coal rights, and that, before conveying such rights to the corporation to be formed, he should require such corporation to refund, through him, to the parties the sums so advanced by them. The parties of the first part (Nease et al.) disclaimed all interest in the railroad. The parties of the second part (Jackson et al.) covenanted and agreed "to make immediate and diligent efforts for the financing of said corporation, and they further covenant that they will make immediate and diligent efforts for financing and thereafter causing the construction of a railroad to the coal lands and property above stated within the time hereinafter mentioned." The date limit within which they were to do this was fixed at December 1, 1900, and it was provided that, if by that date they failed to "substantially arrange with some responsible person or persons for financing the construction of a railroad to said coal lands and for financing said corporation and perform or cause to be performed the provisions of this contract with reference to repayment to the parties of the first part for moneys advanced by them as above set forth," then the interests of the parties should be fixed as follows: The parties of the first part (Nease interest) "shall be entitled to and shall take, have, and hold in lieu of any royalties or other interest an undivided $49/100$ of all such coal rights and coal property, and the parties of the second part shall be entitled to have and hold an undivided $51/100$ of said property." This contract was acknowledged and admitted to record in Lewis, Gilmer, and Braxton counties, on November 21, 22, and 23, 1900, respectively. Under and by virtue of these two contracts referred to, Nease and his associates advanced in all $11,200 to secure and carry the options as required by Gillmor, the trustee. Jackson and his associates advanced a similar sum. On November 17, 1900, two contracts touching these matters were executed. The first one between B. E. Cartwright of the first, H. C. Jackson, A. B. White, W. W. Jackson, G. A. Newlon, of the second, George Gillmor, trustee, of the third, and the Little Kanawha Railroad Company of the fourth, part. H. B. Nye was named as a party therein, but did not sign it. Of the existence, terms, and conditions of this contract Nease was informed.

It sets forth that Cartwright, in conjunction with the parties of the second part (Jackson et al.) is ready "to perform, or cause to be performed, all the acts necessary" under the agreement of May 5, 1900, "to entitle Jackson and associates to require Gillmor, trustee, to account to them for all the proceeds, benefits, and profits from the coal and coal rights in his name, except the royalty provided therein for Nease and associates," and thereupon it was agreed that the parties should at once form the coal corporation, to which Gillmor, trustee, was requested to transfer the options so soon as its organization was effected, and the receipt by him of the money and agreement specified in the May contract. Cartwright agreed to subscribe and pay in cash for enough of the stock of this corporation to enable it, as soon as organized, to pay to Gillmor, trustee, the money which Gillmor was to repay Nease and his associates and to Jackson and his associates for advancements made by them; to make any future payments under the coal agreements and to furnish it with sufficient money, "if any required to operate said coal, should the operation thereof by the company itself be deemed by it wise and to its best interests." Further, Cartwright agreed to pay the Little Kanawha Railroad Company $25,000 in cash, as needed to meet its exigencies, pay all its outstanding indebtedness, and supply the necessary funds needed to extend it to the coal field. In case Cartwright made default, the railroad company was to retain the $25,000 as liquidated damages.

At the execution of the second contract on this 17th day of November, 1900, its terms and conditions were not disclosed to Nease. He charges he had no knowledge of it until a few days before bringing this suit. It was between Cartwright of the first, Jackson, White, Newlon, and W. W. Jackson of the second, and Gillmor, trustee, of the third, part. Nye was also named as a party of the second part, but did not sign or execute it. It sets forth that, as the parties of the first and second parts are about to become interested in the corporation to acquire the coal rights, and are desirous of seeing the railroad extended, Cartright has undertaken to finance such extension, and

Jackson and associates desire to facilitate such negotiations, and Cartwright has suggested the easiest way to accomplish said end would be through the organization of a new company (to be referred to as the Consolidated Company) to take over the railroad and the coal from the respective corporations, it was thereupon agreed, that, upon evidence that such consolidated corporation had been formed, and was reasonably able to perform its obligations in the premises, Jackson and associates should use their best efforts to procure a transfer of all rights and property of the railroad to the Consolidated Company in consideration of settlement of its outstanding obligations and the guaranty of its extension to the coal field, and, further, in consideration of such Consolidated Company paying in cash all the obligations of the coal company, should endeavor to procure from the coal company a transfer of all its rights and property. For this Jackson and associates were to receive 25 per cent. of all stock, bonds, and securities to be issued by the Consolidated Company or the proceeds thereof and 25 per cent. of any profit realized by the railroad after satisfaction of its obligations, or by either Gillmor, trustee, or the coal company in excess of the costs of the coal and coal rights to them (estimating in such costs $4 per acre to Gillmor), and deducting, also, expenditures incurred for buildings and improvements made on the properties and reimbursement of Cartwright of any money contributed by him to either company or property. It was further agreed that the coal corporation agreed to be formed by the other agreement of that day, above set forth, should purchase Jackson and his associates' interests in the name of Gillmor, trustee, in the coal lands, paying the cost thereof per acre with four dollars per acre additional to Gillmor; that the amount already paid by Gillmor in acquiring the coal rights should be refunded, and payments thereafter were to be made as they matured under the options; that the coal company should agree that no transfer of its property or rights should be made, or incumbrance placed thereon, until the $4 per acre was paid in full or secured, and that all stock of said coal company should be transferred and held by W. C. De Camps, as trustee, "subject to the exigencies of the financing of the Consolidated Company." The last two clauses of this contract are as follows: "In case by reason of any unforeseen accident or contingency, the party of the first part (Cartwright) shall fail to finance said Consolidated Company within twelve months from date, then Jackson and associates may, within twelve months thereafter, repay to said party of the first part (Cartwright) the money paid or forfeited to the Little Kanawha Railroad Company under agreement of even date, and the money paid into the coal company, in which case, Jackson and associates shall succeed to the rights and interests of the party of the first part; but, in case Jackson and associates shall fail to refund said money, within said time, then and thereafter said coal is to be held for an opportunity for its sale at best advantage. In the event of sale, out of the proceeds thereof, there shall be first repaid to Cartwright all money contributed by him, then Jackson and associates shall receive four dollars per acre, and anything remaining shall be divided in the proportion of seventy-five per cent. to Cartwright and twenty-five per cent. to Jackson and associates. The clause touching liquidated damages in the contract of even date does not apply to obligations and agreements in this paper expressed." On November 23, 1900, the Braxton Coal Company was chartered with Cartwright, C. B. Shaffer, J. G. Bennett, H. C. Jackson, and G. A. Newlon as incorporators and, seven days after, the attorney for Gillmor, trustee, tendered to Nease the $11.200 which had been advanced by him. This payment was refused. Nease based this refusal upon two grounds. First, because the first contract of November 17, 1900 (the only one of that date of which he had knowledge), was not, in his judgment, a compliance with the contract of May 5, 1900; and, second, because Cartwright was not a man of sufficient financial ability to comply with its requirements. Thereupon Nease, on December 7, 1900, filed his bill in this court against Cartwright, Jackson, and others, setting forth the facts substantially as herein given, charging said agreement not to be in compliance with the agreement of May 5, 1900, and Cartwright financially unable to comply therewith, and praying that Gillmor, trustee, be enjoined from transferring to the Braxton Coal Company the coal options and interests, tendering to pay the sums necessary to pay his share for the coal embraced in said op-

tions, and asking that he be decreed to be a holder of $^{40}/_{100}$ undivided interest therein. This suit was dismissed on plaintiff Nease's motion on January 25th following. Nease alleges it was so dismissed because of assurances made to him by the parties that under the first contract of November 17, 1900, and a subsequent one of November 28, 1900, the Braxton Coal Company had been organized in good faith, and was, and would be, able to carry out in good faith the May contract. Four days prior to the dismissal of this suit, Gillmor, trustee, repaid to Nease the $11,200 advanced by him to secure coal options, and a receipt was given setting forth that it was refunded under the terms of the May 5, 1900, contract and the one of November 28, 1900, executed by the Braxton Coal Company.

He now alleges substantially that the representations whereby he was induced to dismiss his suit were false and misleading; that the second contract of November 17, 1900, was concealed from him; that he only discovered a few days before bringing this suit its existence and its terms; that, under its terms, the substantial financing of the coal proposition, as provided for by the first contract of that date with Cartwright and as contemplated by the May contract, was not accomplished and was not to be. Instead, he charges it was making Cartwright only a decoy figure to afford Jackson and his associates opportunity to finance the coal and railroad companies within two years longer than was contemplated under the May agreement, and, if they failed within that time, to still reap large profit from a sale of the coal interests, regardless of his interests and to his expense and loss. In the meantime, on November 28, 1900, Gillmor, as trustee, had conveyed by deed recorded in Braxton county on December 29, 1900, the coal rights and options to the Braxton Coal Company. On April 11, 1901, H. B. Nye, asserting interest in certain stock of the railroad company, brought his suit in this court against said railroad company, Cartwright, and others, Nease alleges without his knowledge, and upon the allegations by him therein by bill and amended bill made, a receiver was appointed for the railroad. On April 23, 1901, another contract was entered into between Cartwright of the first, H. C. Jackson, White, W. W. Jackson, Nye, and Newlon of the second, Gillmor, trustee, of the third, the Little Kanawha Railroad Company of the fourth, and the Braxton Coal Company of the fifth, part, whereby Nease alleges it was agreed that Nye's suit should be dismissed as against Cartwright, Shaffer, Bennett, Streuber, Newlon, and the Braxton Coal Company; that the railroad company should release Cartwright from all obligations to finance it under the third clause of the first contract of November 17, 1900, and $11,200 which had been advanced by him was to be paid back, and the claim for liquidated damages ($25,000) was to be released. Nease alleges he had no knowledge of this contract until a few months before institution by him of this suit, and that he had no knowledge until within a few days thereof of the terms of the ninth clause of this contract, which further provided, as alleged, that Cartwright, under some other agreement of the same date, was to procure the building of some other railroad into the coal field, and, if he failed, he was to pay the Braxton Coal Company $30,000 liquidated damages. No railroad has been built to the coal field. No coal has been mined. On November 2, 1901, the Braxton Coal Company conveyed by deed the coal rights and options to Richard C. Kerens, trustee, for a consideration of $17 per acre. Two hundred and eighteen thousand dollars of the purchase price was to be paid C. B. Shaffer, trustee, in full settlement of all rights and interests of Shaffer, Cartwright, Bennett, and Smathers in and to the assets of the Braxton Coal Company, the balance to apply to all obligations of the company, and any residue to H. C. Jackson, A. B. White, and G. A. Newlon. This deed of general warranty expressly refers to the contract of May 5, 1900, and is made subject to subsection "b" of its fourth section, quoted in totidem verbis, which provides for payment of one-fifth average royalty to Nease of the coal mined. This deed was recorded in the three counties of Gilmer, Lewis, and Braxton on November 11, 18, and 22, 1901, respectively.

On November 28, 1903, R. C. Kerens in his own right and as trustee, his wife, Stephen B. Elkins, his wife, and Henry G. Davis, by deed, conveyed the coal and coal rights to the Washington Coal & Coke Company, a corporation. In this deed it is recited that Kerens had taken title to this coal field in trust.

195 F.—63

for himself, Davis, and Elkins. This deed also contains the reference to the May 5, 1900, contract, and is made subject to the "royalty" section thereof. It is of special warranty, and in February, 1904, was admitted to record in Lewis and Braxton counties. By deed of date January 23, 1904, the Washington Coal & Coke Company conveyed these coal interests to the Coal & Coke Railway Company, "subject to all conditions contained in the deed from Kerens, Davis, and Elkins to it of November 13, 1903." Prior to this last deed, on October 1, 1903, the Coal & Coke Railway Company executed to the Trust Company of West Virginia a general bond mortgage on its road, branches, coal, and coal lands in the counties of Randolph, Barbour, Upshur, Braxton, Gilmer, Clay, and Kanawha, aggregating about 100,000 acres, "which the party of the first part (Railway Company) is now engaged in acquiring." On May 8, 1909, complainant Nease filed his bill in this court, setting forth substantially the facts as above, and charging that the Braxton Coal Company, Kerens, Elkins, Davis, the Washington Coal & Coke Company, and the Coal & Coke Railway Company, before and at the time of the several conveyances to them, had full notice of the May 5, 1900, contract and of his rights thereunder; that its requirements that a railroad to the coal field should be financed and built have in no manner been complied with; that no railroad has been built to the field and no coal mined after the lapse of near nine years; that, on the contrary, Davis, Elkins, and Kerens, its substantial owners, have built the Coal & Coke Railway, after acquiring these coal interests from the Braxton Company, to develop other coal lands of theirs; that he has demanded from them a full compliance with the May 5, 1900, contract, and received reply from them that they would not mine the coal for 50 years, and would build no railroad to the field.

His prayer is that his interests be by this court ascertained and decreed to be .49 of said coal and coal lands and coal interests; that partition thereof be made, and, in case partition be not susceptible in kind, sale be made of all and .49 of the proceeds be decreed him. To this bill demurrers have been entered, overruled, answers filed, exceptions thereto overruled, issues joined, evidence taken, and the cause submitted for final hearing. The allegations of defense made are that Nease is estopped from maintaining this suit by laches, limitations, election, record, deed, and matters in pais.

W. E. Chilton and C. D. Merrick, for complainant.
Van Winkle & Ambler, for defendants.

DAYTON, District Judge (after stating the facts as above). This controversy must depend primarily upon the construction to be given the contract of May 5, 1900. Two preliminary questions raised seem to me to be clearly determined.

First. That whatever rights thereunder vested in Nease, Kelsey, and Hadley are now owned by Nease. The interests of Hadley and Kelsey were originally only contingent ones derived from Nease. Hadley conceded this, and, by his own sworn answer filed in the injunction cause instituted by Kelsey, admitted he had not complied with the contingent requirements, and therefore disclaimed any interest. As to Kelsey's interest, a compromise agreement, a trustee's sale, and deed made thereunder fully vested it in Nease.

[1] Second. The defense of want of notice of the rights of Nease under this contract of May 5, 1900, sought to be asserted by the subsequent purchasers, Kerens, Elkins, Davis, the Washington Coal & Coke Company, and the Coal & Coke Railway Company, cannot be maintained. This for the very plain reason that this contract had been properly acknowledged by the parties and duly admitted to record in the three counties of Lewis, Gilmer, and Braxton where said coal lands were situate, on November 21, 22, and 23, 1900, respectively.

The deed of Gillmor, trustee, to the Braxton Coal Company, was not executed until five days after, November 28th, and was not admitted to record until December 29, 1900. The deed of the Braxton Coal Company to Kerens, trustee, was not executed until a year after. Thus, under our state statute, these subsequent purchasers were bound to take notice of this contract. They had to take notice, not only of one, but of all, of its clauses and provisions.

[2, 3] In construing this contract of May 5, 1900, for the purpose of determining what rights were secured to Nease therein, we may well remember that it must receive that construction which will best effectuate the intention of the parties. This intention must be ascertained, not from detached parts, but from the whole agreement. "Greater regard is to be had to the clear intent of the parties than to any particular words which they may have used in the expression of their intent." If the meaning is not clear, we must consider the circumstances under which the contract was made, the subject-matter, and the relation of the parties to aid us in ascertaining its true intent and purpose. Parol evidence is admissible to show these. Clark on Contracts, 590.

[4] It is very clear that Jackson and his associates, owning the majority stock of the Little Kanawha Railroad Company, a corporation greatly involved and unable to extend its line so as to be profitable in operation, primarily desired to secure for it sufficient funds to liquidate its outstanding obligations, extend its line, and put it on a paying basis. The first contract between them and Nease, that of November 25, 1899, was executed with this purpose in view. Both sides, under it, had the right to negotiate the $600,000 mortgage loan necessary to finance the railroad. Both failed, and disagreement and litigation followed. In the meantime they had secured options on the 25,000-acre coal field. Nease had put his money in this to the extent of at least $5,000 under the contract. He had nothing in the railroad except a speculative profit, contingent upon his ability to secure some one else to finance it. This was the condition of things at the time the compromise agreement of May 5, 1900, was executed. A careful analysis of this contract demonstrates its purposes to be (a) to settle all disputes and disagreement and dismiss all pending litigation inter partes; (b) to define the interests of the parties in and to the coal interests and options; (c) to provide for the taking up of such options and securing the coal in fee; (d) to take away from Nease all right to negotiate the financing of the railroad and vest such right in Jackson and his associates alone. To carry out these purposes, the contract provided: (1) That the coal rights should be held by Gillmor in trust only for the parties in accord with the terms of the contract. (2) Jackson and his associates should organize a coal corporation to which Gillmor, at their request, should convey the options and coal rights obtained. (3) Pending the organization and financing of the corporation, each party was to contribute equally the necessary funds to pay for the coal rights as payments therefor matured, and for the expenses incident to the taking up thereof. (4) That Gillmor, as trustee, should not convey to the corporation until it, by agreement

duly executed and acknowledged, should bind itself (a) to make payment of all unpaid purchase money due under the terms of the option; (b) agreeing not to lease the coal or any part thereof to any concern or persons, retaining to the corporation, or any of its officers, any financial interest; (c) to pay monthly to Nease and associates a one-fifth average prevailing royalty on all coal mined; (d) allowing. Nease's representative free access to the coal lands and rights and to the corporation's books of account and records of shipment; (e) agreeing that the corporation should not mine other coal as long as the 25,000 acres could be mined as profitably. (5) The contract further provides that Gillmor, before conveying such coal rights to the corporation, should further require it to refund to him all moneys paid by the parties in the securing of such rights which he was to pay over to the parties in the amounts contributed by them. (6) That Jackson and associates should make immediate and diligent efforts to (a) finance the coal corporation; and (b) to finance and cause the construction of a railroad to the coal lands. (7) In case they failed in these two undertakings and in having the money advanced to secure the coal rights refunded to the parties on or before December 1, 1900, then the rights of parties were to be "finally fixed, determined, and defined" to be that Nease and associates were to have "in lieu of any royalties or other interest an undivided .49 of all such coal rights and coal property" and Jackson and associates the remaining .51 thereof. Two plans, in the alternative, seem clearly to have been provided for, the primary one the extension of a railroad into and the mining of the coal. Within what time? The securing of the financial backing, necessary for these purposes, by Jackson and associates, was expressly limited to December 1, 1900, less than seven months from the contract's date. No limit, by express terms, was fixed wherein the railroad should be built and the mining operations commence. Was such limit implied? In my judgment, yes, a reasonable limit. The contract provided that "immediate and diligent" efforts should be put forth to secure the necessary means to build the road and commence mining operations; that royalty should be paid monthly; that access to the field, to the books of account, and the records of shipment should be granted; that no part of the coal field should be leased; and that no other coal should be mined by the company to be formed in preference. All these provisions negative the idea that either side contemplated at the time that Nease was to surrender his vested half interest in these coal rights for the promise of a fractional royalty, not to accrue, possibly, within his lifetime. The clear intent was that the means to build the railroad, pay for the coal, and to conduct mining operations should be secured within seven months, and therewith the road should be built and mining operations commenced within a reasonable time thereafter. But what if the means to build the railroad and to open and operate the mines were not secured? Under such circumstances, it is clear that this contract undertook to settle, fix, and finally define the rights of parties by vesting an undivided .49 interest in the options, coal rights, and coal in Nease subject to his liability to contribute one-half of the outstanding and unpaid purchase

money, required by the options and contracts to be paid by Gillmor, trustee, to the owners of the coal rights and coal lands. Having reached this conclusion, after long and earnest study of the contract and the circumstances surrounding and giving rise to its execution, it seems to me, with full notice in law by reason of its recordation, no subsequent purchasers could purchase, as against the fixed and vested rights of Nease, any other right or interest, or upon any other terms and conditions, than those provided to be vested in the coal company to be formed to operate, and imposed upon that company and upon Jackson and his associates; in other words, upon the Braxton Coal Company to operate and mine the coal within a reasonable time, and upon Jackson et al. to secure, within a like reasonable time, the extension of the railroad to the coal for its transportation, if it was desired to hold Nease to the royalty provision set forth in the contract. Failure, within such reasonable time, to comply with these requirements, necessarily involved the concession on their part of Nease's right to a .49 undivided interest in the coal properties, subject to their right to be reimbursed one-half of the actual cost of such properties paid and payable to the landowners under the original options and optional contracts, and necessary expenses, with such interest as may have accrued since the dates of payment.

[5] This conclusion it seems to me to be inevitable upon the well-settled principles: That purchasers, with full notice of another's rights, cannot secure any greater right or interest as against such other's right than that vested in their vendor, and, when their vendor's right is incumbered with certain and fixed obligations to be performed in futuro, they take cum onere.

[6, 7] Further, where vested interests in real estate are secured by executory contracts, acknowledged and recorded, under all ordinary conditions. the defense of laches in asserting and maturing such interests into perfect legal title is not applicable. Such interests may be divested and lost by reason of open, notorious, adverse, and exclusive possession under hostile title, color, or claim of title for the period required by statute; but, where one holds in privity of title with another, he will not be permitted to plead the neglect or laches of that other in asserting and taking possession of his interest. In such case he will be held to be a trustee for the other.

[8] It is undeniable that coal in place in the ground is in this state realty, and not personalty. Nease, by this contract, had a vested interest in this coal in place in the ground.

[9] It was a clear right that these purchasers had to require his joinder in the conveyance of the Braxton Coal Company to them either releasing wholly his rights in the premises, or restricting them solely to the royalty interest, upon pain of their refusal to purchase. This they did not do, and they must be held, by thus ignoring him in the purchase, to have elected to assume the obligation of the Braxton Coal Company to carry out the requirements of the May 5, 1900, contract, to mine and transport coal within a reasonable time, pay a royalty thereon, or concede the .49 undivided interest in the coal as real estate. A careful consideration of such cases as Hammond v. Hopkins, 143 U. S. 224, 12 Sup. Ct. 418, 36 L. Ed. 134, Felix v. Patrick,

145 U. S. 317, 12 Sup. Ct. 862, 36 L. Ed. 719, Patterson v. Hewitt, 195 U. S. 309, 25 Sup. Ct. 35, 49 L. Ed. 214, Twin-Lick Oil Co. v. Marbury, 91 U. S. 587, 23 L. Ed. 328, Hayward v. National Bank, 96 U. S. 611, 24 L. Ed. 855, and Holgate v. Eaton, 116 U. S. 33, 6 Sup. Ct. 224, 29 L. Ed. 538, cited by counsel in support of this defense of laches, seem to me to clearly demonstrate that they are here wholly inapplicable for these reasons: (1) There was no fraud or concealment by Nease of his rights and interests in these properties. They were set forth fully in a written contract, duly acknowledged and recorded, before any conveyance made to any one by the other joint owners, whereby, under the law, the world had complete notice. (2) The Braxton Coal Company took these properties upon the express conditions that it would perform toward him the conditions and in accord with the true purpose and intent of this express contract. It was organized for this express purpose and executed its express contract to do so. It thereby, so far as Nease was concerned, became a trustee for the purpose of executing its purposes, intent, and conditions. (3) The subsequent purchasers had not only legal notice by reason of the recordation of the contract, but direct personal notice as shown by the verbatim quotation in their deeds from the contract of the royalty clause, whereby they took the place only of the Braxton Coal Company subject to all of its obligations to Nease. The rights of Jackson and associates had passed absolutely to this company which they had formed. Nease's certainly had not. The contract expressly set this forth. The character of his interests was dependent upon whether the properties were made mining ones or one of purchase of real estate to either hold as investment or for speculative profit by sale. (4) The property never was made a mining one, but apparently one of investment in real estate by these purchasers from the Braxton Coal Company, and therefore their interests became simply those of any ordinary purchaser of real estate with an interest in another outstanding with whom such purchaser became a cotenant thereof. It is well settled in such case that such purchaser can secure the outstanding interest in only two ways—by purchase (by deed, descent, will, or legal proceedings), or by ouster and adverse possession under the statute of limitations.

[10, 11] Finally, I cannot see wherein Nease has estopped himself from asserting his right. It is insisted he has: (1) "By record. In abandoning former suits." This contention is fully answered by the facts developed in the case. He says he dismissed his suit, the one brought by him against the Braxton Coal Company, Cartwright, et al., wherein he was asserting his right, under assurances that the Braxton Coal Company had been organized in good faith, and would be able to carry out the intent and purposes of the May 5, 1900, contract. The evidence bears out this statement; but, if it did not, his interest could not be destroyed by either the institution or dismissal of a suit on his own motion where no defense was made and no right adjudicated. (2) "By writing. In giving a receipt for money derived from these purchasers under date of January 21st, 1901, and agreeing to dismiss the suit that had been brought to assert the right." The plain

answer to this contention is that the Braxton Coal Company was under contract to refund through Gillmor, trustee, this money, $11,200, advanced by him, as a condition precedent to its right to take over the properties under the terms of the May 5, 1900, contract, and this payment was made, and this receipt given, with the understanding, that it was in accord with this condition precedent of the May 5, 1900, contract. The receipt so shows on its face. None of the subsequent purchasers had anything to do with this payment. The Braxton Coal Company can hardly allege that the rights of Nease are destroyed because it in one particular only undertook to perform its obligations, wholly failing, however, in the performance of all others. This contention is much the same as would be that of a man who, having contracted to buy another's farm, insists, because his vendor has received from him a part of the purchase money, he is estopped from enforcing the balance. Nease must account for this payment it is true. In other words, if he is to have a .49 interest decree to him, he must now pay a full half of the cost of the properties as sold to Gillmor, trustee, by the landowners, under the options. Had he not received from the Braxton Coal Company, through Gillmor, trustee, this $11,200, he would have been entitled to credit therefor on this sum that he must now pay. It seems to me the other grounds of alleged estoppel relied on are, in effect, but different statements of those above given, and need no further consideration. I am therefore driven to the conclusion that this defense cannot avail.

[12] The only remaining question is whether such compliance with the May 5, 1900, contract has been made by Jackson and associates, the Braxton Coal Company, or by its subsequent vendees, as will justify the further withholding from Nease the right to demand a .49 interest, instead of the royalty interest conceded to him by defendants. As I have construed the contract, it was its clear requirement that transportation facilities should be secured and mining operations conducted within a reasonable time after the date of the contract. Nearly nine years had elapsed from the date of the contract until this suit was brought. No railroad facilities have been secured and no mining operations commenced. On the contrary, Nease's statement is substantially undenied that he was informed by those in authority and control of the present claimant of the properties, the Coal & Coke Railway, that no purpose to build a railroad to the property and no expectation to mine the coal in the next 50 years was entertained. Under these circumstances I think the "reasonable time" to convert this into a mining proposition has gone by, that it must be held simply an investment one in real estate, and that this court of equity must decree to Nease the .49 interest therein which he demands, and partition thereof as prayed for in the bill. But in doing so it must be charged with the payment of one-half of the total cost of the properties incurred under the original options from the landowners and by reason of expenses in securing said options and perfecting thereunder the titles. To ascertain what this sum shall be, a reference to a master will be necessary.