# Richmond.

## RICHMOND ENGINEERING AND MANUFACTURING CORPORATION v. F. P. LOTH.

## WILLIAM A. BURCKHARD & CO. v. F. P. LOTH.

## GUILFORD MARBLE AND TILE COMPANY v. F. P. LOTH.

## W. F. MAHONEY v. F. P. LOTH.

## W. McMILLAN & SON, INC. v. F. P. LOTH.

## HAMMETT FIREPROOFING COMPANY v. F. P. LOTH.

## NORFOLK IRON AND WIRE WORKS COMPANY v. F.P. LOTH.

## C. D. PRUDEN COMPANY v. F. P. LOTH.

### AND

## SITTERDING-CARNEAL-DAVIS COMPANY v. F. P. LOTH.

January 18, 1923.

Absent, Burks, J.

1. WORKING CONTRACTS—*Action by Subcontractors and Materialmen Against Owner—Construction of Promise of Owner to Pay Subcontractors and Materialmen—Case at Bar.*—In the instant case, owing to the financial difficulties of the general contractor, the subcontractors had either stopped work on the building or slowed up. In order to assure the continuance of the work the owner entered into an agreement with the general contractor and his surety to the effect that all money due or which might thereafter become due to the general contractor from the owner should thereafter be paid out by him directly but only to such subcontractors performing work on the building as

should be designated by one of the architects who should determine the amount to be paid to the same. At the same time the subcontractors and materialmen were notified by letter that an agreement had been perfected between the owner and the general contractor by which all money due the subcontractors or materialmen would be paid directly by the owner to the subcontractors, and acting upon this letter, which they construed as an absolute promise of the owner to see them paid, the subcontractors continued work upon the building. The main question at issue in the instant case, an action by the subcontractors against the owner, was what construction should be put upon the letter. Was it to be construed as a promise by the owner, binding him to pay the unpaid subcontractors and materialmen, not only the money then owing and subsequently becoming due, which the owner might owe upon a final settlement with the general contractor, but also whatever money was then owing and would subsequently become due to the unpaid subcontractors and materialmen from the general contractor, even though the owner might not owe the general contractor a sufficient balance upon final settlement to cover such money.

*Held:* That the letter was a promise by the owner to pay the subcontractors whatever was due or might become due to them irrespective of what the owner might owe the general contractor upon final settlement; and moreover that the evidence established that such was the understanding of the owner.

2. CONTRACTS—*Interpretation—Standard of Interpretation.*—To determine the legal meaning of a contract, a standard of interpretation must be first established. Wigmore enumerates four possible standards: "The standard of the community, or *popular* standard, meaning the common and normal sense of words; the *local* standard, including the special usages of a religious sect, a body of traders, an alien population, or a local dialect; the *mutual* standard, covering those meanings which are peculiar to both or all parties to a transaction, but shared in common by them; and the *individual* standard of one party to an act as different from that of the other party or parties, if any." And to these may be added the sense in which the party using the words should reasonably have apprehended that they would be understood by the other party.

3. CONTRACTS—*Interpretation—Standard of Interpretation—Character of the Contract*—The standard of interpretation adopted by the law depends on the character of the contract under consideration. In one division must be put not only formal contracts, such as sealed instruments and negotiable paper, but also contracts where the parties have agreed on a writing or other fixed symbol as a memorial or integration of the agreement. In this class must also be put contracts of which the law requires a written memo-

randum. Such a memorandum need not necessarily be an integration or memorial of the contract; but the purpose of the law in requiring written evidence can only be satisfied if the same standard is applied to memoranda under the statute as is applicable to written contracts. In the second division must be put all other contracts, and the standard of interpretation for contracts of this second division is the sense in which the party who used the words in question should reasonably have apprehended that the other party would understand them.

4. CONTRACTS—*Interpretation—Standard of Interpretation Where a Writing has been Adopted or is Required by Law.*—When the parties have assented to a writing as an expression of their agreement, or where a writing is required by law, the standard of interpretation is the local standard; that is, the natural meaning of the writing to parties of the kind who contracted, at the time and place where the contract was made, and with such circumstances as surrounded its making.

5. CONTRACTS—*Interpretation—Intent Ineffectively Expressed.*—The mental intent of the parties to a contract may be inadequately expressed in two kinds of cases. Thus, (1) there may be an intent which is wholly unexpressed, whatever standard of interpretation may be adopted. It is not only possible but common for a party to fail to express by the language he uses what he intends to express; or (2) the intent may be inadequately expressed, but the language of the writing though not naturally bearing the sense intended by the one who used it, if the words are taken individually, whether they are interpreted according to the normal standard, or even according to the local standard, nevertheless indicates the intent by the general tenor and purpose of the contract if taken in connection with surrounding circumstances.

6. INTERPRETATION AND CONSTRUCTION—*Intent—Written Contracts.*—If the parties have made a memorial of their bargain, or a writing is required by law, their actual intent unless expressed in some way in the writing is ineffective, except when it can be made the basis for reformation of the writing.

7. INTERPRETATION AND CONSTRUCTION—*Intent—Oral and Written Contracts.*—In contracts of which no memorial is made, and no writing required by law, it is doubtless true that where parties have made a bargain which both of them understand in a certain sense, their intent (which at least has been made plain to one another) must be sought, however inadequately it may have been expressed. But in written contracts this is not true, and the intention of the parties can be found only in the expressions of the parties in the writing.

8. CONTRACTS—*Interpretation and Construction—Intent—Written Contracts.*—In the interpretation of written contracts it is not the real intent but the intent expressed or apparent in writing which is sought.

9. CONTRACTS—*Interpretation and Construction—Surrounding Circumstances*

—*Intent—Intent of both Parties—Intent as Expressed in the Contract.*— It is true that the court will always put itself in the place of the contracting parties, and although the contract is in writing, will read it in the light of all the circumstances surrounding the parties when the contract was made, and, further, where the writing only partly expresses the intention in question and is ambiguous because of careless or inapt expressions, the court may consider the actual intention in aid of the interpretation of the writing; still, in such case, it is not merely the intention of one of the parties which is to be considered, but the intention also of the other party, or parties, to the contract as found substantially expressed in the writing itself, when the court reads the whole of it in the light of all of the aids to interpretation mentioned.

10. Contracts—*Interpretation and Construction—Written Contracts—Expression of Intent—Notice by Owner of Building to Subcontractors that He Would See Them Paid—Case at Bar.*—In the instant case, where, owing to financial difficulties of the general contractor, work on the building had been interrupted, the subcontractors were notified by letter that in accordance with an agreement between the owner and the general contractor they would be paid directly by the owner. The owner contended that his intent was merely to notify the subcontractors that an agreement had been made between him and the general contractor, by which all money due or to become due from himself to the general contractor would be paid directly to the subcontractors, but this conditional intent was not expressed in the notice.

  *Held:* That if the letter be regarded as a promise to answer for the debt of another within the statute of frauds, and therefore requiring a writing, then if the intent of the owner was to impose a limitation on his promise, it was wholly unexpressed, and according to the standard of interpretation in such cases was ineffective, and the result would be the same if the letter was regarded as evidencing an original undertaking, and to be construed in "the sense in which the party who used the words in question should reasonably have apprehended that the other party would understand them."

11. Working Contracts—*Construction of Contract—Reference in Contract to Other Instrument—Case at Bar.*—In the instant case, an action by subcontractors against the owner of a building, owing to financial difficulties of the general contractor, the owner had agreed with the general contractor to pay over directly to the subcontractors money due or to become due from him to the general contractor. At the same time the subcontractors and materialmen were notified that an agreement had been perfected between the owner and the general contractor, by which all money due the subcontractors or materialmen would be paid directly by the owner to the subcontractors.

8

*Held:* That the reference in the notice to the subcontractors of the agreement between the owner and the general contractor did not give the subcontractors constructive notice of the contents of that agreement.

12. WORKING CONTRACTS—*Promise of Owner to Pay Subcontractors and Materialmen—Failure of Subcontractors to Make Demands on Owner Until it was Ascertained that Balance Due General Contractor Would Not Pay Their Claim—Estoppel—Case at Bar.*—In the instant case, in order to expedite construction, the owner of a building wrote a letter to the subcontractors and materialmen notifying them that by agreement with the general contractor all money due them would be paid directly by the owner, also stating that the payments to the subcontractors would be sent out by check signed by a member of a firm of architects, and that all bills should be rendered to the general contractor.

*Held:* That, under the circumstances disclosed by the evidence, the fact that the subcontractors made no demand upon the owner until the insufficiency of the balance owing the general contractor to pay their claims was discovered, did not show that the subcontractors understood the letter as having the meaning contended for by the owner that his promise was conditional upon a balance remaining due the general contractor, but that the promise was an unconditional promise to pay the subcontractors and that this action did not estop the subcontractors.

13. GUARANTY — *Interpretation — Strictissimi Juris.*—An accommodation guaranty is to be construed *strictissimi juris,* but a guaranty given for the business advantage of the guarantor, and written by himself, instead of being construed in his favor, comes within the general rule that the words of the writer must be construed most strongly against him.

14. CONTRACTS—*Promise—Promise Not a Technical Term.*—There is nothing technical in the word "promise." Any writing signed by one and addressed or given to another, by which the writer declares his willingness, assent, or intention to pay that other a certain sum of money, is a promise to pay that sum, whatever be the form of words in which it is clothed.

15. CONTRACTS—*Offer—Acceptance.*—An offer of reward, an offer of a price for goods or services, becomes a contract when what is requested is given or done, though no obligation to give or to do anything ever exists.

16. CONTRACTS—*Unilateral Contracts—Assent.*—The assent of the promisee to a unilateral contract may be indicated by an act requested by the promisor, but of which he has no knowledge.

17. CONTRACTS—*Assent—Words.*—Though assent must be expressed to be legally effective, it need not be expressed by words.

18. CONTRACTS—*Promise—Definition—Certainty.*—A promise, from the very meaning of the word, involves an undertaking to do something in the future. The chief requirement is that the promise shall be sufficiently certain in its terms to enable the court to understand what the promisor undertakes.

19. CONTRACTS—*Offer—Definition.*—An offer is a statement by the offeror that he will give a return for some promise or act of the offeree. An offer is always a conditional promise, and it may be a contract.

20. WORKING CONTRACTS—*Promise by Owner to Pay Subcontractors—Acceptance—Case at Bar.*—An owner in order to expedite construction wrote to the subcontractors and materialmen that by agreement with the general contractor all money due the subcontractors or materialmen would be paid directly by the owner to the subcontractors.

 *Held:* That this constituted an offer on the part of the owner, and that the act of the offerees in furnishing material and labor for the construction of the building constituted an acceptance.

21. WORKING CONTRACTS—*Promise of Owner to Pay Subcontractors—Consideration—Case at Bar.*—In the instant case, in order to expedite construction, an owner of a building notified the subcontractors and materialmen that they would be paid directly by the owner.

 *Held:* That the work and labor furnished by the subcontractors, unincumbered by any lien, or claim of lien, or suit, was a sufficient consideration to support the promise of the owner.

22. CONTRACTS—*Consideration—Original Contract or Promise to Pay the Debt of Another.*—Whether the promise of an owner of a building to pay directly subcontractors for work done upon the building was an original contract or a promise to pay the debt of the general contractor, the promise required a valuable consideration to support it.

23. CONTRACTS—*Consideration—Adequate Consideration—Executed Contracts.*—If the consideration for a promise has any value whatever, it is sufficient to support the promise and render it enforceable. Whether the consideration is commensurate with the promise is immaterial. And where a promisor receives in exchange for his promise something which he was not previously entitled to receive, it is an adequate consideration to support the promise, though it is but a peppercorn.

24. APPEAL AND ERROR—*Parties to Appeal—Cross Assignments by Unappealing Complainants Who are Made Appellees.*—In the instant case, a suit by subcontractors and materialmen against the owner of a building, various other subcontractors and materialmen filed their petitions. Several of these parties did not appeal from the decree under review, but were appellees, and were served with or acknowledged the process, and were before the Supreme Court of Appeals as such upon the appeal.

 *Held:* That under Rule VIII of the Supreme Court of Appeals, cross assignments of error by such parties could be considered.

25. MECHANICS' LIENS—*Limitation of Actions—Interruption of Running of Statute by Suit—Suit by Others.*—The institution of a suit in equity, which was not a general creditors' suit or a general creditors' lien suit, but had for its sole object the enforcement of the mechanic's lien and other alleged rights of the plaintiff in the suit, and to which another lienor was not made a party, and did not in any way become a party, until it filed its petition to enforce its mechanic's lien and other alleged rights, which was more than six months after the whole amount covered by the lien claimed by it became payable, did not suspend as to such second lienor the running of the period in which the statute (Code of 1904, section 2481) required suit to enforce any such lien to be brought.

26. WORKING CONTRACTS—*Promise by Owner to Pay Subcontractors—Intent of Parties.*—Where an owner of a building, in order to expedite construction, notified a subcontractor that in accordance with an agreement with the general contractor the owner would pay directly the subcontractor for work upon the building, and both the pleadings of the owner and the subcontractor were agreed that the owner's promise did not extend further than to pay the subcontractor from the balance due by the owner to the general contractor, and that the acts of the subcontractor were not intended as an assent to a promise on the part of the owner to pay its claim without limitation, the actual intent was material and barred the plaintiff from establishing any other contract than that claimed in its petition, as the acts were in themselves ambiguous.

27. JUDGMENTS AND DECREES—*Judgment Confined to Issues Made by the Pleadings.*—A court must in every case confine its decision to the issues made by the pleadings and established by the proof in the particular case.

28. WORKING CONTRACTS—*Direct Payment to Subcontractors—Architects to Designate Payments to Subcontractors.*—A building contract provided that the general contractor should be paid eighty-five per cent. of work erected on the 15th of every month and the remainder when the building was completed, and also provided that in each case a certificate should be obtained and signed by the architects. By a subsequent contract the owner was to pay the subcontractors and materialmen directly from sums due or to become due the general contractor, such sums to be paid out by the owner only to such sub, contractors, etc., as should be designated by J., one of the architects who should determine the amounts to be paid to them.

*Held:* That the provision with reference to designating the materialmen and determining the amounts to be paid to them by J. had reference to his action as one of the architects referred to in the prior contract, and that J. was given no arbitrary right to designate to whom or what amounts were to be paid under the latter contract.

29. WORKING CONTRACTS—*Rights of Subcontractors to Participate in Balance Due General Contractor by Owner—Case at Bar.*—In the instant case, a suit by subcontractors to subject balance due by the owner of a building to the general contractor to their claims, complainant was denied by the decree under review participation in the distribution of the balance. The rights of the respective subcontractors to share in the distribution of the money due from the owner to the general contractor accrued, respectively, following the incorporation of their labor and material into the work erected, at the times they respectively obtained a certificate of the architect, or were entitled to receive such certificate, and to the extent of eighty-five per cent. of the amounts covered by such certificates, the remaining fifteen per cent. becoming due and payable after the completion of the building. The record did not disclose whether plaintiff had obtained the architect's certificate for his claim, or whether he had been entitled to obtain such certificate. Therefore, whether there was an error in the decree in not allowing plaintiff to participate in the distribution depended on whether or not claims of other subcontractors and materialmen prior in right aggregated such a total before any part of plaintiff's claim became fixed in right to share in the distribution by obtaining the architect's certificate that no balance of the fund was then left, and owing to the silence of the record as to the certificate of the architect, this could not be determined.

30. WORKING CONTRACTS—*Subcontractors—Liability of Owner to Subcontractors—Case at Bar.*—In the instant case, where the owner and general contractor agreed that the owner would pay the subcontractors for work done directly, upon an architect's certificate, from money due the general contractor, if, by any breach of the contract, the owner defeated any rights of the subcontractors to share in the sum due by the owner to the general contractor, the owner would be personally liable to the subcontractors. ·

Appeal from a decree of the Chancery Court of the City of Richmond. Decree for defendant. Complainants appeal.

*Reversed.*

The first above entitled cause is the original suit and all the other above entitled causes arose by petitions filed in the original suit.

The decree under review was entered on July 22, 1920. It overruled all exceptions of the plaintiffs and

also of the defendant Loth, in all of said causes, to the master commissioner's report, dated October 17, 1918, which, in response to the direction of prior decrees, reported upon all of the issues involved in said causes which are involved in the assignments of error, and approved and confirmed such report in all respects; the effect of which was to hold, among other things, that there was no personal liability upon the defendant, Loth, as claimed by all of the plaintiffs in the above entitled causes, other than Sitterding-Carneal-Davis Company, to pay any of the claims of any of such plaintiffs asserted in such causes, or any part thereof; that the plaintiff Sitterding-Carneal-Davis Company's mechanic's lien, sought to be enforced by the petition of that company, was barred by reason of the fact that the petition was not filed within the period required by statute; and that no right to such a share of the money in the hands of the defendant, Loth, existed in favor of such company, as claimed in the petition of such company.

The material facts and holdings of the master commissioner's report, bearing upon the holdings of the decree under review, are as follows:

The defendant, Loth, on July 20, 1912, entered into a contract with R. H. Richardson & Sons, Incorporated, under which the latter was to furnish the material and labor and construct for the former, on a lot owned by him in the city of Richmond, a certain building known and designated as the Chamber of Commerce building. The plaintiffs in the above entitled causes were all subcontractors under Richardson & Sons and furnished labor, or material, or both, which were accepted by the owner and used in the construction of said building.

The testimony of a number of witnesses was taken before said master commissioner, the stenographic report of which, and a number of exhibits filed with such

depositions, were all returned with said report and appear in the record. The following facts found by the commissioner from such evidence and certain of the commissioner's holdings appear from the following quotations from said report:

"The original contract between Loth and R. H. Richardson & Sons, Inc. (Exhibit 'F. P. L. No. 1,' filed with the answer of Frank P. Loth to the original bill in the first of the above styled suits), dated July 20, 1912, provided for an eight story building at an agreed price of $120,000, with two additional stories, if desired by the owner, at the price of $17,500, and the completion of the typical unfinished floor for $4,000—making a total of $141,500 for the ten story building complete, except electric work, vacuum cleaner, heating and elevators, bids for which were to be obtained by the architects and added to the contract price.

"Provision was also made in said contract for payment of $6.00 per cubic foot for any extra foundation concrete, and of $18.00 per M (city of Richmond measurement) for all *extra* brick work.

"The contract also provided that the owner might require any alteration, deviations, additions or omissions from contract requirements, to be added or deducted from the amount of the contract price at a fair and reasonable valuation.

"There was also a proviso that if the contractor refused or neglected to supply sufficient material or workmen, the owner, after three days' notice in writing, should have the power to supply the necessary material and workmen and finish the building—the expenses to be deducted from the amount of the contract.

"On the 15th of each month eighty-five per cent of the amount due for work then erected was to be paid, and the remaining fifteen per cent when the building

was completed. A bond in the penalty of $30,000 for the faithful performance of the contract was executed by Richardson & Sons, Inc., with the Aetna Accident and Liability Company as surety.  (Loth's Ex. No. 26.)

"From 'Ex. F. P. L. No. 53,' filed with answer of F. P. Loth, it appears that the total cost of said building, including contract price and all extras, was $181,609.86. From this sum are to be deducted certain credits therein enumerated for items called for by the contract but not installed, and also for $560 omitted adjustable windows (Johnston's deposition, p. 150)—said deduction aggregating $2,268.66, and leaving the net cost of the building $179,341.20.

"From the same exhibit it appears that Loth has credited himself on account of this building with the sum of $170,764, of which $72,700.36 had been paid to the general contractor prior to April 2, 1913, as follows, to-wit:

"1912

| | |
|---|---:|
| Sept. 17 | $ 3,714.50 |
| Oct. 18 | 1,330.50 |
| Dec. 16 | 26,978.75 |

"1913

| | |
|---|---:|
| Jan'y 15 | 8,969.10 |
| Feb'y 15 | 15,297.67 |
| Mch. 11 | 16,409.84 |
| "Total | $72,700.36" |

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*

"R. H. Richardson & Sons, Inc., the general contractor for the Chamber of Commerce building, was at the same time the general contractor for the erection of the Bellevue school building for the city of Richmond,

and the firm of Carneal & Johnston were the architects and supervisors of both buildings on behalf of the respective owners. While this corporation seems to have been formed for the express purpose of bidding for, and carrying out, these two large contracts, its money capital consisted of only about $300. For some time previous to the formation of the corporation of R. H. Richardson & Sons, Inc., the principal parties interested therein, had been conducting a contracting business in and around Norfolk, Virginia, as partners under the firm name of R. H. Richardson & Sons, and this partnership continued in business after the formation of the corporation.

"In late February, or early March, 1913, the partnership of R. H. Richardson & Sons went into bankruptcy, and the Dun Mercantile Agency in error reported that R. H. Richardson & Sons, Inc., had become bankrupt. All of the subcontractors of R. H. Richardson & Sons, Inc., on both Richmond jobs, at once became alarmed for fear that they would lose the money already due them for work and materials theretofore furnished and for such work and materials as they might thereafter furnish. Some of the subcontractors on the Chamber of Commerce contract who had not yet begun to perform their contracts refused to do so without a personal guaranty or promise from Loth, the owner, that they would be paid, and other subcontractors who had already performed part of their contracts either stopped work altogether, or slowed down in their work very materially, while awaiting developments.

"As a result of the small capital upon which the corporation was attempting to finance the construction of these two large buildings, together with the injury done to its credit by the false report of its bankruptcy, R. H. Richardson & Sons, Incorporated, had become so em-

barrassed financially during March, 1913, that it could not pay its subcontractors the money already due them, and it was apparent that it could not complete its contracts without outside financial aid. Carneal & Johnston, the architects for both buildings, seem to have been able to make some satisfactory arrangement for the financing of the Bellevue school contract, but that of the Chamber of Commerce contract appears to have been more difficult.

"Application was first made to Loth, the owner, to advance to R. H. Richardson & Sons, Inc., a sufficient sum to pay off the amount then due to the subcontractors on the Chamber of Commerce, but this he declined to do. Then the principal subcontractors united with R. H. Richardson & Sons, Inc., in the effort to secure a loan of $12,000 from the Richmond Bank and Trust Company to be applied to their debts, agreeing to waive their rights to mechanic's lien—but this also failed.

"By the latter part of March, 1913, it had become apparent to Loth, as well as to all subcontractors conversant with the situation, that the general contractor could not proceed further with its contract unless and until the subcontractors were given reasonable assurance of getting their money—for it appears that much of the money that had theretofore been ·paid to the general contractor by Loth on account of the Chamber of Commerce contract had been applied by the contractor to the payment of subcontractors on the Bellevue school contract.

"Accordingly negotiations were begun between Loth, the owner, R. H. Richardson & Sons, Inc., the general contractor, and the Aetna Accident and Liability Company, surety on the $30,000 bond of the general contractor, which resulted in.the drafting of an agreement,

dated March 21, 1913 (Loth's Exhibit No. 1), which, however, was never executed by the parties, and which was almost identical in terms with the subsequent agreement of April 2, 1913, hereinafter quoted.

"Further negotiations (Loth's Exhibits Nos. 13, 21, 22 and 23) resulted in the supplementary written agreement of April 2, 1913, between the owner and the general contractor.

"This agreement (see copy quoted in full on page 4 of answer of F. P. Loth), after referring to the original contract of July 20, 1912, for the erection of said building, provides that for the better protection of said Loth the parties have agreed—

" 'That all sums of money which may now be due, or which may hereafter become due, to the said Richardson & Sons by said F. P. Loth, growing out of the performance of said contract, and in accordance therewith, shall be paid out by him only to such subcontractors, laborers and material men as shall perform labor upon and furnish material to said building, and as shall be designated by J. A. Johnston, who shall also determine the amount to be paid to the same. The amount which shall be held by the said F. P. Loth to meet such payments to be made to laborers and material men, as above set forth, shall be in such amounts and at such times as shall become due and payable by the said F. P. Loth to the said Richardson & Sons in accordance with the terms of the said contract.

" 'All payments (which) shall be made in accordance with this agreement shall be considered and held as payments made on the contract price.

" 'Any balance which may remain in the hands of the said F. P. Loth, after the payments herein provided to be made, shall be paid over by him to the said Richardson & Sons, or their assigns.'

"To this agreement was appended the following:

" 'The Aetna Accident and Liability Company, of Hartford, Connecticut, surety on the bond of R. H. Richardson & Sons, Incorporated, for the performance of the contract above referred to, hereby assent to the above agreement between F. P. Loth and R. H. Richardson & Sons, Incorporated.

" '(Signed) The Aetna Accident and Liability Co.,
" 'By C. K. Mount, Attorney in Fact.'

"At the same sitting at which the above supplemental agreement was executed Loth, R. H. Richardson & Sons, Inc., and C. K. Mount, representing the bonding company, approved, and directed Johnston to send to all subcontractors on the Chamber of Commerce building, the following letter, which was multigraphed for the purpose:

" 'Richmond, Va., April 2, 1913.

" 'To all subcontractors and material men on the Chamber of Commerce building, Richmond, Va.

" 'F. P. Loth, Owner.

" 'R. H. Richardson & Sons, Incorporated, Contractors.

" 'Carneal & Johnston, Architects.

" 'Gentlemen:

" 'An agreement has been perfected between Mr. F. P. Loth and R. H. Richardson & Sons, Incorporated, by which all money due subcontractors or material men will be paid directly by the owner to the subcontractors. This money will be sent out by a check signed by J. A. Johnston, agent, member of the firm of Carneal & Johnston.

" 'In order that all accounts may be kept straight we have established a rule that all bills shall be rendered R. H. Richardson & Sons, Incorporated, in duplicate. These bills shall not include any item whatever which

is not chargeable against this particular contract. These bills must be approved and authorized for payment by R. H. Richardson & Sons, Incorporated.

" 'Kindly govern yourself by the above instructions and see that your bills are sent through the proper channel.

" 'Very truly yours,

" '(Signed) Carneal & Johnston.'

"The letter was multigraphed, and a copy sent to Loth and to the most, if not all, of the subcontractors. Mr. Johnston testifies (p. 233) that Richardson & Sons, Inc., had the letters addressed, and furnished him with a list of those to whom the letter was sent (p. 204); that it was intended that the letter should be sent to all subcontractors; that so far as he knew none were omitted. The list furnished by Richardson, however, (p. 157) does not include I. J. Smith & Co., who claim in their petition to have received said letter, nor McMillan & Son to whose counsel Johnston personally gave a copy of said letter, nor the Guilford Marble and Tile Company.

"The testimony of the president of the latter company (pp. 58, 59, 60 and 61) seems, however, to prove that it also received a copy of said letter.    *    *    *    *

"Loth admits responsibility for the letter, and that it was sent out with his knowledge and approval.

"It is also admitted that none of the subcontractors had actual knowledge of the terms of the contract of April 2nd.

"The question at issue, therefore, is whether by this letter a personal liability was fixed upon Loth in favor of those claiming such liability.

"Loth contends that the letter was a mere notice to the subcontractors of the execution of the supplemental agreement of April 2nd, and of the fact, as provided by

said agreement, that thereafter the money due to the general contractor would be paid by the owner directly to the subcontractors instead of through the general contractor, as theretofore, and that said supplemental agreement must be read along with said letter and as a part thereof in determining its meaning and effect. He further contends that if any personal liability attached to him by reason of said letter it can *only* be based upon *estoppel*, that is, that he is estopped to deny that the agreement between himself and the general contractor was other than that stated in said letter—in which case the strict rules of pleading and proof as to estoppel must apply.

"The complaining subcontractors, on the other hand, contend that the letter is complete in itself; that they are in no way bound by the terms of said supplemental agreement, nor did said letter put them on notice of the terms of said agreement; that said letter was a *promise* on the part of Loth to pay all money due subcontractors or material men, or, if said letter did not amount to an actual promise, then that said letter, in the circumstances, plainly admitted of the construction that Loth would pay the claims of all subcontractors; that they placed this construction upon it, and were thereby induced to perform or complete their subcontracts.

"These contentions involve the determination of the following points:

"(1) Was the reference to the contract of April 2nd in the letter such a reference as to put the recipient upon notice of the terms of that contract, and to obligate him to inform himself of those terms at his peril?

"I do not think so. The letter did not refer the recipient to the contract for its terms. If it had done so, he would have been undoubtedly charged with knowl-

edge of those terms. The letter merely stated that a contract had been entered into by the owner and general contractor and then proceeded apparently to state the effect of that contract as to subcontractors and material men.

"I am, therefore, of opinion that the contract of April 2nd should not be read or construed as a part of the letter so far as the relations of Loth and the subcontractors are concerned, and that the subcontractors, in the absence of actual knowledge of the terms of said contract, were not charged with such knowledge by said letter. The rights and liability of the subcontractors and of Loth depend, in my opinion, upon the terms of the letter itself independent of the terms of the said contract.

"(2) Did the letter constitute a *promise* on the part of Loth to the subcontractors to pay all money due to them? I do not think so. The language of the letter alone must determine this question, and I do not think it admits of that construction. It is certainly not an express promise, nor is it an offer made by Loth, the acceptance of which would bind Loth. It was a statement that a contract had been made between Loth and the general contractor by the terms whereof all money due subcontractors and material men would be paid directly by the owner (Loth) to the subcontractors. This is a statement of fact, not a promise, and I so hold.

"(3) Was the letter calculated to induce the subcontractors receiving it to believe that Loth had agreed with the general contractor to assume personal liability for the payment of all subcontractors and material men?

"I think it was. I have already briefly outlined the circumstances leading up to and attending the writing of this letter. The general contractor was financially

embarrassed, practically insolvent, and unable to pay the amounts already due to many of the subcontractors; the partnership of the same name, consisting of practically the same persons, had just gone into bankruptcy and the general contractor had been erroneously reported by Dun as a bankrupt. A considerable portion of the money theretofore paid to the general contractor by Loth on the Chamber of Commerce contract had been diverted by the contractor to the Bellevue school contract; vain efforts had been made by the general contractor to borrow money with which to pay the subcontractors; the general contractor no longer had any credit; the building was about two-fifths completed; the general contractor was under a $30,000 bond; and the owner was a man of large independent means and extremely anxious for the speedy completion of the building. All of these facts were known to the subcontractors.

"The balance due and to become due to the general contractor, together with the $30,000 bond, would amply protect the owner, and the language of the letter suggested this interpretation.

"Loth contends that the words, 'will be paid directly by the owner to the subcontractors,' should have put the subcontractors on notice that they were only to receive directly from the owner, instead of through the general contractor, such amounts as might be due to the general contractor by the owner.

"I do not think that the word '*directly*' has any such effect. The letter states that 'all money' due to subcontractors will be paid by the owner, and then instructs them to continue to send their bills to the general contractor. It was most natural, therefore, for the subcontractors to construe the word 'directly' only to mean that the money would be paid by the owner into their hands instead of through the general contractor.

"While Loth, in his contract of April 2nd with the general contractor, limited his liability to the amount then due or which might thereafter become due to the general contractor on this contract, yet he seems to have been so assured that he was absolutely protected against all possible loss, because of the balance in his hands and the $30,000 bond, that he himself construed this letter as an assurance to the subcontractors that he would pay all of their claims.

"In a letter dated May 23, 1913, to the Colleton-Cypress Company (Loth's Exhibit No. 31), by whom a copy of this letter had been received on April 30, 1913 (part of same exhibit), Loth says:

" 'In this connection will state that I have made arrangements with the general contractors to look after payments of all bills covering materials, etc., used in the Chamber of Commerce building, Richmond. Messrs. Carneal & Johnston are handling this for me, however, so that bills, etc., sent direct to them will have attention in due time.'

"That the same idea was in the mind of Johnston is evidenced by the following letter to the Colleton-Cypress Company, dated April 28, 1913 (Loth's Exhibit No. 31), in answer to one from them in which they stated that Richardson & Sons, Inc., had written them that the owner would pay for all material for the building and asking for assurance from the architects on this point:

" 'We beg to acknowledge receipt of yours of April 25th, and would enclose you herewith copy of a circular letter which we sent out on April 2nd.

" 'The owner is Mr. F. P. Loth, of Waynesboro, Va., and we would refer you to Dun or Bradstreet or to the Bank of Waynesboro as to his financial standing.

" 'If the material is sent to Richmond for use on this building you will certainly get paid for it.'

9

"I am satisfied that Loth did not intend to mislead the subcontractors as to the facts, but am equally satisfied that the letter of April 2, 1913, was couched in such terms as to be calculated to mislead them, and that if it did mislead them to their prejudice, then Loth is estopped to deny the liability which he is stated in said letter to have assumed.

"(4) Did the letter of April 2, 1913, or other statements in conjunction therewith, mislead the complaining subcontractors, or any of them, to their prejudice?

"This can only be determined from the evidence in each case, but, before taking up the separate claims of the complaining subcontractors, there are several points in common to be disposed of.

"Loth contends that the complaining subcontractors were legally obligated to complete their respective contracts in any event and that, therefore, they cannot hold Loth liable on the ground of estoppel, even though they were induced by said letter to complete said contracts.

"The authorities cited on pages 17 and 18 of Mr. Meredith's brief seem to clearly establish the rule that—

" 'The doctrine of estoppel has no application in cases where the representations which are claimed to give rise to it tend only to induce a party to do some act he is already legally bound to do.'

"In this case, however, those subcontractors who claim to have been induced by said letter to complete the performance of their contracts were not legally bound to complete them in view of the financial condition of the general contractor, and his failure to perform his part of the contract in the case of those to whom he already owed money. This contention is therefore not sustained.

"Loth also contends that if the letter of April 2nd is relied upon to fix personal liability on him, then in order to establish such liability it must be shown that the subcontractors have complied with the alleged conditions imposed by said letter by first having their bills approved and authorized for payment by R. H. Richardson & Sons, Inc.—which has only been done by W. F. Mahoney.

"I do not think this contention can be sustained. The representation relied on by way of estoppel is contained in the first paragraph of the letter. The paragraph giving instructions as to how bills shall be made out and approved begins with these words:

" 'In order that all accounts may be kept straight *we* have established a rule,' etc.

"The letter is signed by Carneal & Johnston. I think that this was a rule of convenience adopted by Carneal & Johnston, the architects, and is not a condition upon which the liability of Loth depends. If the bills are correct and Loth is liable therefor, this liability is not defeated by the failure to secure the approval and authorization of the general contractor under the circumstances."

Thereupon the commissioner's report deals separately with the claims of all of the said plaintiffs asserting the personal liability of the defendant, Loth, based on he alleged promise of Loth contained in said letter of April 2nd (which embrace the claims of all of such plaintiffs, except Sitterding-Carneal-Davis Company), from the standpoint taken, and the conclusion is reached by such commissioner that such claims of personal liability of Loth could be sustained only upon the theory that the letter was calculated to mislead such plaintiffs to their prejudice, so that they would be entitled to recover of Loth by reason of said letter to the extent and only to the

extent that they sufficiently alleged and proved that Loth is estopped to deny his personal liability. And, dealing with the subject as governed by the rules of law applicable to estoppel, the commissioner holds that none of the claims of personal liability in question have been established, and so reports.

As bearing upon the aforesaid claims asserting the personal liability of the defendant, Loth, as based on the aforesaid alleged promise in the letter of April 2nd, the following additional statement will be made:

"The building, as the commissioner reports, was entirely completed on January 9, 1914. The Exhibit F. P. L. No. 53, referred to in the above quotation from the commissioner's report, was not made up until January 29, 1914. It was not until then that Loth knew definitely the status of the accounts between him and the general contractor. And it was not until about this time that he first knew the status of the accounts with the subcontractors. Loth kept no books showing these accounts and Carneal & Johnston, the architects, kept no books showing what amounts were owing to the general contractor or subcontractors. All that the books of Carneal & Johnston showed was the amounts paid out by Loth from time to time. As of April 2, 1913, Loth did not know, nor did Carneal & Johnston, what amounts were owing and left unpaid by the general contractor to the subcontractors for material and labor which had entered into the building up to that time and for which Loth had paid the general contractor $72,700.36 as of that date; nor did either, prior to that date, make any inquiry as to this. None of the plaintiff subcontractors knew or had any information about this until about the time the building was entirely completed, when some of them heard something about it, to the effect that there would not be a sufficient balance

left owing from Loth to the general contractor to pay all claims of sub-contractors. Some of the plaintiffs did not learn about this until Loth wrote them to that effect on February 10 and 12, 1914. Loth, however, admits in his testimony that one of the Richardsons, a short time prior to April 2nd, informed him (Loth) that the general contractor had used some of the money, which had been paid by Loth as aforesaid, in the payment of subcontractors on the Bellevue school contract. Loth did not then or thereafter inquire how much of such money had been so diverted. He told none of the subcontractors on the Chamber of Commerce building about it. He did not even tell his architects, Carneal & Johnston, about it, nor any one, so far as the record shows. Johnston testifies that he knew nothing about such diversion of funds until about the time the Loth building was about completed, and it does not appear that he then knew how much had been so diverted; nor does it appear in the record how much was so diverted prior to April 2nd.

The McMillan & Son's claim was for stone which was placed in the building prior to April 2, 1913. The material and labor embraced in the claim of all of the other plaintiffs in the above entitled causes were in some cases partly furnished before and partly after April 2, 1915. There is direct evidence in the record in support of all of said claims respectively, except that of Sitterding-Carneal-Davis Company, to the effect that the material, and material and labor, which was furnished prior to April 2, 1913, were surrendered to the defendant, Loth, free of claim of lien or suit because of his personal promise alleged to have been contained in the said letter of that date and in consideration of such promise; that the material and labor furnished after April 2, 1913, was furnished because of and in consideration of that promise;

and that none of such plaintiffs attempted to fix any lien on the building or other liability on the defendant, Loth, or instituted any suit, until after they found that Loth denied any personal liability because of said promise. There is also evidence to the effect that all of such plaintiffs, after April 2, 1913, up until they knew that the balance owing by Loth to the general contractor was insufficient to pay the unpaid claims of the subcontractors and material men in full, communicated with the general contractor and Carneal & Johnston only; the contracts for labor and material made after April 2nd being in the form of contracts with the general contractor or orders from the general contractor accepted and filled by the subcontractors; the requisitions for payments from time to time being made upon the general contractor; that partial payments were made to all of such plaintiffs after April 2, 1913, from time to time by the defendant, Loth, by checks signed "F. P. Loth, Chamber of Commerce contract, J. A. Johnston, agent"; and that it was not until after the plaintiffs discovered, as aforesaid, that there would not be a sufficient balance left owing from Loth to the general contractor to pay all unpaid claims of subcontractors that any personal demand was made by any of such plaintiffs on Loth.

The evidence also shows, however, that following said letter of April 2nd, none of the plaintiffs made any inquiry as to what balance was owing from Loth to the general contractor, but rested content with the alleged promise contained in said letter; and that promptly following the time that they respectively learned that such balance would be insufficient to pay all claims of subcontractors, they, other than Sitterding-Carneal-Davis Company, respectively, made personal demand upon Loth, and upon his refusal to recognize liability under

such demand, they respectively attempted to file liens, and some of them attempted to give personal notices under the statute, and later they all brought the suits involved in the appeal. Further, that in the pleadings in all of such suits, except the petition of Sitterding-Carneal-Davis Company, the plaintiffs declared and sought to recover upon said personal promise alleged to be contained in said letter; and that prior to the furnishing by such plaintiffs and the receipt by the defendant, Loth, of the aforesaid consideration for said alleged promise, as aforesaid, the promise was not withdrawn by the said Loth.

As bearing upon the claim of Sitterding-Carneal-Davis Company, the following statement will be made:

This plaintiff takes the position in its petition that it furnished the material to the amount of its claim, $3,138.45, in reliance upon the *contract* of April 2, 1913, mentioned in the letter of that date, aforesaid, and upon the promise contained in these two papers when read together.

This plaintiff also claims in such petition that the institution of the principal suit stopped the running of the statute of limitations requiring the bill or petition seeking the enforcement of mechanics' liens to be brought within six months from the time the amount covered by the mechanics' lien fell due.

The record shows that Sitterding-Carneal-Davis Company did furnish the material to the amount of its claim in reliance upon the promise alleged as aforesaid, and that on October 24, 1913, its bill therefor, to the extent of the amount of $3,073.50, was "approved and authorized for payment by R. H. Richardson & Sons, Incorporated;" that the bill was thereupon presented to J. A. Johnston, agent, for payment, and payment was not made.

The record further shows that Sitterding-Carneal-Davis Company perfected their mechanics' lien in accordance with the statute covering the whole amount of its claim, to-wit, $3,132.45; that the entire amount of such claim became due and payable January 10, 1914, but the petition to enforce such lien was not filed until August 15, 1917, when it was filed in the principal suit of *Richmond Engineering & Manufacturing Company* v. *F. P. Loth and R. H. Richardson & Son, Inc.*, who were the only defendants thereto, and which was not a general creditors' suit nor a general lien creditors' suit, but the individual suit of the plaintiff therein seeking to enforce its own mechanics' lien, etc.

The said commissioner's report held that the mechanics' lien of Sitterding-Carneal-Davis Company was barred because the petition seeking to enforce it was not filed in the time required by statute; that the balance in the hands of Loth as of the date of the report was $12,798.58, with interest thereon at six per cent from January 9, 1914; and that "the subcontractors, material men and laborers, who performed labor upon and furnished material for said building and who have not been paid in full are entitled * * to share said balance ratably." The commissioner, however, on this subject, added this:

"How far valid mechanics' liens and personal liability of Loth, established by certain of these beneficiaries, may affect the rights of other beneficiaries in said * * fund, I do not undertake to report, as that is a matter of law for the court and is not within the terms of the reference."

The provisions on this subject of the decree under review are as follows:

"And it appearing from said report that there is in the hands of the defendant, F. P. Loth, the sum of

$12,798.58, with interest thereon from January 9, 1914, amounting in the aggregate to $17,790.03, applicable to the payment of certain claims asserted by Richmond Engineering and Manufacturing Corporation and others; and from statement X that said Loth is personally liable to J. H. Morris & Co., and others, to an amount aggregating principal and interest $10,327.73, which, being credited against the $17,790.03 retained by Loth, as aforesaid, leaves $7,462.30, as shown by said statement Y, balance for payment of said mechanics' lien creditors, the court adopting said statements X and Y as being correct memoranda of the payments made by Loth on account of said personal liability claims and the balance applicable to mechanics' lien creditors as aforesaid, doth adjudge, order and decree that the said defendant, F. P. Loth, do forthwith deposit in the Savings Bank of Richmond to the credit of this court in these causes the sum of $7,462.30, and file a certificate of deposit among the papers to be attached to the original draft of this decree.

"And it further appearing from said statement Y that the balance on hand as aforesaid ($7,462.30) will pay a dividend of .7895 per cent. to each of said mechanics' lien creditors, it is further ordered that when and so soon as the said Loth shall have made deposit as hereinbefore directed, the court will make provision by future decree for a distribution of said fund amongst the proper parties according to their rights."

It appears from statements X and Y referred to in the provision of the decree just quoted that the claim of Sitterding-Carneal-Davis Company is not allowed to participate in the distribution of the fund mentioned.

The Richmond Engineering and Manufacturing Company and C. D. Pruden Company did not appeal from the decree under review, but that decree was entered in all

of the above entitled causes heard together, and these parties in the briefs filed in their behalf on the appeal by the other plaintiffs make the cross-assignment of error that the decree was erroneous in denying their right of recovery upon the aforesaid alleged personal liability of Loth to them; and such parties were served with or acknowledged service of process of and are before the appellate court as appellees.

Other references to the evidence appear in the opinion.

*A. W. Patterson,* for appellant Richmond Engineering and Manufacturing Corporation.

*Williams & Mullen,* for appellant W. M. McMillan & Son, Inc.

*S. S. P. Patteson,* for appellants Wm. A. Burckhard & Co., Hammett Fireproofing Company, Guilford Marble and Tile Company, and Norfolk Iron and Wire Works Company.

*R. Grayson Dashiell,* for appellant Mahoney.

*Miller & Miller,* for appellant C. D. Pruden Company.

*D. C. O'Flaherty,* for appellant Sitterding-Carneal-Davis Company.

*C. V. Meredith,* for appellee.

SIMS, J., after making the foregoing statement, delivered the following opinion of the court:

The material questions presented by the assignments and cross-assignments of error will be disposed of in their order as stated below.

As stated in the brief of counsel for the defendant, Loth—

[1]  1. "The main question at issue is what construction should be put upon the letter" of April 2, 1913; is it to be construed as a promise of Loth, binding him to pay the unpaid subcontractors and material men not only the money then owing and subsequently becoming due, which Loth might owe upon a final settlement with the general contractor, but also whatever money was then owing and that should subsequently become due to the unpaid subcontractors and material men from the general contractor, even though Loth might not owe the general contractor a sufficient balance upon final settlement to cover such money?

The question must be answered in the affirmative.

The inquiry involves the consideration of "the relation that must exist between volition (or intention) and expression," as affecting the interpretation of acts which are essential to the formation of a contract, which Mr. Wigmore characterizes as "the world-old legal problem, inevitably faced in the history of every jurisprudence." 4 Wigmore on Ev., sec. 2404. The breadth and profundity of the subject and the ability with which the volitional side of the problem has been urged in argument for the defendant in the causes before us (that side being too much emphasized by such argument, as we think), seem to warrant the somewhat extended quotations which we shall hereafter make of some concrete conclusions from a learned work on Contracts, which we believe to be correct in principle and in accord with the almost, if not quite, unanimous holding of modern decisions, and which, too, are on the whole in accord with the views of Mr. Wigmore on the subject when those views are all considered together. The great length with which the latter learned author has treated

this subject renders it impracticable for us to convey his meaning by quotations within the space available to us.

[2] In 2 Williston on Contracts, secs. 603, 604, 605, 607, 810, this is said:

Sec. 603. "In order to determine the legal meaning of a contract a 'standard of interpretation,' to use Wigmore's helpful phrase, must first be established—that is the code by which the meaning of the language and acts of the parties is to be defined. It is useless to talk of the 'meaning' of a contract unless it is known whose meaning is sought; and this inquiry, as will be seen, cannot be disposed of by the answer—the meaning of the parties. Wigmore distinguishes four possible standards: 'The standard of the community, or *popular* standard, meaning the common and normal sense or words; the *local* standard, including the especial usages of a religious sect, a body of traders, an alien population, or a local dialect; the *mutual* standard, covering those meanings which are peculiar to both or all parties to a transaction, but shared in common by them; and the *individual* standard of one party to an act as different from that of the other party or parties, if any.

"A slightly different further standard may, however, be supposed for a bilateral transaction. This standard is the sense in which the party using the words should reasonably have apprehended that they would be understood by the other party    *    *  .' "

Sec. 604. "*Different standards of interpretation must be applied to different classes of contracts.*

[3] "The standard of interpretation adopted by the law depends on the character of the contract under consideration. In one division must be put not only formal contracts, such as sealed instruments and negotiable paper, but also contracts where the parties have agreed

on a writing or other fixed symbol as a memorial or integration of the agreement. *In this class must also be put contracts of which the law requires a written memorandum.* Such a memorandum need not necessarily be an integration or memorial of the contract; but the purpose of the law in requiring written evidence can only be satisfied if the same standard is applied to memoranda under the statute as is applicable to written contracts. (Last italics supplied.)

"In the second division must be put all other contracts. * *"

Sec. 605. "In contracts of the second class, the standard of interpretation which the modern law tends to accept, and which is supported by sound principle, is that suggested at the end of section 603; namely, the sense in which the party who used the words in question should reasonably have apprehended that the other party would understand them."

[4] Sec. 607. *"Standard of interpretation where a writing has been adopted.*

"According to the weight of authority and on principle, when the parties have assented to a writing as an expression of their agreement, or *where a writing is required by law*, the standard of interpretation is the local standard—that is, the natural meaning of the writing to parties of the kind who contracted, at the time and place where the contract was made, and with such circumstances as surrounded its making. * *" (Last italics supplied.)

[5-8] Sec. 810. *"The intent of the parties, where the contract is written, is ineffectual unless expressed in the writing.*

"The mental intent of the parties to a contract may be inadequately expressed in two kinds of cases which it is important to differentiate in discussing interpretation.

"1. There may be an intent which is wholly unexpressed, whatever standard of interpretation be adopted. It is not only possible but common for a party to fail to express by the language he uses what he intends to express. He would himself admit this if the deficiency in his language were pointed out to him. A lawyer who has attempted to draw a complicated trust or contract, knows how easy it is to omit to provide for one of many possible contingencies which he intends to cover.

"2. The intent may be inadequately expressed, but the language of the writing though not naturally bearing the sense intended by the one who used it, if the words are taken individually, whether they are interpreted according to the normal standard, or even according to the local standard, nevertheless indicates the intent by the general tenor and purpose of the contract if taken in connection with surrounding circumstances. Cases which fall under these two headings doubtless shade into one another. Nevertheless the distinction is a real one, and it may be said without qualification that if the parties have made a memorial of their bargain, or *a writing is required by law*, their actual intent unless expressed in some way in the writing is ineffective, except when it can be made the basis for reformation of the writing. It is true that it is commonly said that the court in the interpretation of contract is endeavoring to find the intention of the parties. The natural meaning of this language is that the court is endeavoring to find as a controlling factor what, as has just been seen, may be wholly ineffectual. In contracts of which no memorial is made, and *no writing required by law*, it is doubtless true that where parties have made a bargain which both of them understand in a certain sense, their intent (which at least has been made plain to one another)

must be sought, however inadequately it may have been expressed. But in contracts of the other class, this is not true, and although courts may say they are seeking the intention of the parties, the assertion is even more emphatic that this intention can be found only in the expressions of the parties in the writing. In effect, therefore, it is not the real intent but the intent expressed or apparent in the writing which is sought."

See to same effect note 12 Am. & Eng. Ann. Cas., p. 392; *McNeer* v. *C. & O. Ry. Co.*, 76 W. Va. 803, 86 S. E. 887; *Stonega Coal & Coke Co.* v. *L. & N. R. R. Co.*, 106 Va. 223, at pp. 226-7, 55 S. E. 551, 9 L. R. A. (N. S.) 1184. Citations of other authorities to the like effect might be multiplied indefinitely.

[9] It is true that the court will always put itself in the place of the contracting parties, and, although the contract is in writing, will read it in the light of all the circumstances surrounding the parties when the contract was made; and, further, where the writing only partly expresses the intention in question and is ambiguous, because of careless or inapt expressions, the court may consider the actual intention in aid of the interpretation of the writing; still, in such case, it is not merely the intention of one of the parties which is to be considered, but the intention also of the other party, or parties, to the contract as found substantially expressed in the writing itself, when the court reads the whole of it in the light of all of the aids to interpretation mentioned. *Rockefeller* v. *Merritt*, 76 Fed. 909, 22 C. C. A. 608, 40 U. S. App. 666, 35 L. R. A. 633; *Nease* v. *Coal, etc., Co.* (D. C.), 195 Fed. 987; *Bower* v. *McCormick*, 23 Gratt. (64 Va.) 310; *Deans* v. *Eldredge*, 217 Mass. 583, 105 N. E. 449; *Shenandoah, etc., Co.* v. *Clark*, 106 Va. 100, 55 S. E. 561.

[10] On applying the principles and rules of inter-

pretation above mentioned to the interpretation of the letter of April 2, 1913, when read in the light of all the surrounding circumstances as shown in evidence, we are of opinion that the letter expresses the promise of the defendant, Loth, to pay to the plaintiffs, other than Sitterding-Carneal-Davis Company, the money in question.

Loth testifies that°at the time the letter was signed by his agents and sent out to the plaintiffs (all admittedly authorized at the time by him), the sole intent which he had in mind was merely to notify the subcontractors and material men that the agreement had been made between him and the general contractor by which all money due and to become due from himself to the general contractor would be paid directly by himself to the subcontractors and material men, and such money only.

Now, if such limited or conditional intention existed in the mind of Loth at the time mentioned, it was certainly not expressed in any way in the letter. The language used contains no suggestion that any limitation upon his undertaking was intended or that any condition was attached thereto. The reference to the agreement between Loth and the general contractro and the words "paid directly" make the letter unequivocally express the meaning, as we think, that all money due (then or thereafter) by the general contractor to the subcontractors and material men would be paid by the owner to the subcontractors and material men, and that the money would be sent out by checks signed by J. A. Johnston, agent for Loth, without any limitation upon the undertaking other than that the money must be for material or labor furnished for the said building and be due the subcontractors or material men from the general contractor. Therefore, if the letter be regarded as a promise "to answer for the

debt of another," so that it is within the statute of frauds (Code, sec. 5561), then when interpreted in accordance with the standard of interpretation applicable under the authority above quoted, it must be construed to be a promise to pay the money in question without the condition or limitation claimed by Loth, for the reason that, if the intent on his part to impose such limitation or condition existed at the time, it was wholly unexpressed in the letter.

But a careful consideration of the evidence convinces us that the actual intent in the mind of Loth at the time the letter was signed and sent out was to express thereby the undertaking to pay the subcontractors and material men all money for material or labor furnished as aforesaid due them, then or thereafter, by the general contractor, without any actual intent then existing of limiting the amount to what he might owe the general contractor. Loth's own testimony shows that at that time he did not have in mind to put such a limitation upon his undertaking. His testimony itself shows—and the other evidence is to the same effect—that Loth at that time had no idea that such a limitation would ever become material. He then had been recently informed by one of the Richardsons that the general contractor had diverted some of the seventy-two thousand and odd dollars of money paid by Loth on the Chamber of Commerce building and used it to pay subcontractors on another building contract. But Loth evidently did not think that such diversion of funds had been of any considerable amount, or that it would at all affect the sufficiency of the amount he still owed and would owe the general contractor to amply cover all money due and to become due to subcontractors and material men on the Chamber of Commerce building. Loth did not even inform his architects of what Richardson had told him. Ac-

10

cording to Johnston's testimony, he knew of no diversion of funds until about the time the Chamber of Commerce building was completed. Loth had no investigation on the subject made. And the contract of April 2nd between Loth and the general contractor shows that Loth then thought, and doubtless so did Richardson & Sons, that there would be a balance owing to the general contractor on final settlement upon completion of the building, after all money due subcontractors and material men was paid, otherwise the provision in the contract on that subject would not have been embraced in it. It seems plain to us that the letter of April 2nd is but an instance of what often occurs in business transactions, namely, the failure of a good business man at times to inform himself accurately of existing conditions or to anticipate and provide in his contracts or undertakings against liability in the event of situations developing in the future, which might reasonably have been anticipated as probable or likely to arise, but which were not thought of at the time. Loth by the letter expressed what he, indeed, then intended, namely, the unqualified general undertaking aforesaid, without thinking or anticipating at the time that the undertaking was too broad; that a situation might develop in the future in which that undertaking would render him liable for more than he had agreed to pay the general contractor. Hence he omitted to qualify the undertaking contained in the letter in that particular so as to protect himself against the situation which unexpectedly to him did in fact afterwards develop. Had his attention been called to this at the time he doubtless would have admitted the omission and have inserted words supplying the omission; unless, indeed, he had recognized, what we think from the testimony for plaintiffs was probably true, that the letter would not have been satisfactory to

those to whom it was addressed with such a limitation expressed in it, so that it would not have accomplished the business purpose he had in view in sending out the letter. But we need not enter upon the consideration of such a feature of the transaction. It is sufficient for the decision of the question before us to confine ourselves to the letter itself, and to its correct interpretation as applied to the situation which afterwards developed. That situation unquestionably arose, at least in part, from the aforesaid diversion by the general contractor prior to April 2nd of money which Loth had paid him as aforesaid. To what extent this caused the insufficiency of the balance, left owing to the general contractor on final settlement, to pay all unpaid subcontractors and material men, the record does not disclose. It may have been the cause of the whole of such deficiency, or there may have been other causes, such as the cost of labor and material being greater than anticipated, miscalculation, bad management, etc., all of which might reasonably have been anticipated as likely to occur, but which clearly, according to the evidence, did not occur to the mind of Loth at the time of the aforesaid letter as likely to happen, at least not to such an extent that he then thought that he would suffer any loss by reason of the undertaking on his part contained in the letter. He doubtless had in mind at the time the expected profit of the general contractor from the contract and also the bond of the contractor for $30,000.00, standing between him and any such loss. The record does not disclose whether that bond does or does not still stand as an indemnity against such loss. But whether it does or does not is immaterial to the subject under consideration. The reliance upon that bond, as reported by the master commissioner, was undoubtedly one of the features which induced the aforesaid absence

of any thought in the mind of Loth at the time of the letter that he would suffer any loss by reason of the undertaking contained in the letter. If he has lost that indemnity for any reason, that too was a thing that he might have anticipated might occur, and he could, for that reason also, have put some qualification upon the undertaking in the letter, but, as aforesaid, he omitted to do so.

If the letter in question were regarded as evidencing an original undertaking on the part of Loth, and not the mere promise to pay the debt of another, so that the standard of interpretation, enunciated by Williston in the above quotations from that learned work, applicable to the second class of contracts mentioned were applicable to the interpretation of the letter, the result would be the same. According to that standard the letter would be construed in "the sense in which the party who used the words in question should reasonably have apprehended that the other party would understand them." When we consider that the plain and unequivocal language of the letter conveyed the unconditional meaning aforesaid; that the plaintiffs had no information which tended to induce any of them to give any other meaning to the letter than that borne upon its face; and that the testimony of or for them is direct and express to the effect that they each, except Sitterding-Carneal-Davis Company, construed and acted upon the letter as the unconditional undertaking of Loth to pay them the money in question; we think the letter must be so construed, even under the standard of interpretation last mentioned.

Therefore, whether we regard the promise contained in the letter as within or without the statute of frauds, the conduct of the promisees in furnishing the material and labor in accordance with the terms of and with in-

tent to accept the promise, constituted the acceptance of the promise, and consummated the completed contracts between the defendant, Loth, and the promisees, respectively, who thus acted.

[11] We do not understand that it is claimed in argument for the defendant, Loth, that the reference in the letter to the "agreement" which had been "perfected" between him and the general contractor, gave the plaintiffs constructive notice of the contents of that agreement (to-wit, of the contract in writing aforesaid). Hence we do not review any of the many authorities on that subject, and shall content ourselves with saying that as the reference is an indirect one, does not purport to refer to the contract as limiting the unqualified undertaking expressed in the letter, which, by the terms of the letter, is complete in itself, we are of opinion that the letter did not give the plaintiffs constructive notice of the contents of the contract.

[12] It is earnestly and ably argued in behalf of the defendant, Loth, that the conduct of the plaintiffs, after April 2, 1913, consisting of their communications being confined to those with the general contractor and the architect, Johnston, and of no claim having been made upon Loth of personal liability, until after the insufficiency of the balance owing to the general contractor to pay all unpaid claims was discovered; and of demands for money having been uniformly before this made by the plaintiffs of the general contractor and Johnston—one or two of plaintiffs going so far as to claim to Johnston that his representations had made him personally liable to such plaintiffs—shows that none of the plaintiffs understood the letter as having the unconditional meaning aforesaid, but understood it as Loth claims he reasonably apprehended they would understand it; and that even if this be not true, the

aforesaid conduct of the plaintiffs estops them from relying on any other interpretation of the letter. Upon this subject we deem it sufficient to say that in view of the course of dealing requested by Carneal & Johnston in the second and third paragraphs of the letter, we do not think that the failure of the plaintiffs to communicate with or make any personal demand upon Loth before the aforesaid insufficiency of funds was discovered, has any significance adverse to the claim of the plaintiffs of the personal liability aforesaid on the part of Loth to them. We find nothing to the contrary in the holdings in the cases of *Detroit Savings Bank* v. *Loveland*, 168 Mich. 163, 130 N. W. 678, and *Wright* v. *Terry*, 23 Fla. 160, 2 So. 6, cited and relied on for the defendant, Loth. In both of these cases, the circumstances were very different from those in the record before us.

In truth, the conduct of Loth and of the plaintiffs, other than Sitterding-Carneal-Davis Company, respectively, in so far as the matter of non-communication with each other, and the demands of the plaintiffs upon the general contractors and Johnston, between the time of the letter and the discovery of the aforesaid deficiency of funds is concerned, is entirely consistent with the respective positions taken by them after such discovery. So that we receive no aid in the interpretation of the letter from the conduct of the parties in this particular which is so much relied on in argument for the defentant, Loth.

[13] It is also urged in behalf of the defendant, Loth, that the general rule applicable to guaranties, of *strictissimi juris*, is applicable to the letter of April 2nd. On the subject of such rule, in 2 Williston on Contracts, sec. 625, this is said: "* * it must ce confined to cases of sureties for accommodation. A guaranty given

for the business advantage of the guarantor, and written by him; instead of being construed in his favor, indeed comes within the rule so often applied to insurance policies, 'that the words of the writer of the policy will be taken most strongly against him.' * * * The question whether slight variations of risk shall discharge a surety from liability under his contract is often confused with the questions of the interpretation of his promise but should be considered separately."

We do not think the form of the first paragraph of the letter prevents its being construed as the promise or undertaking of the defendant, Loth, to pay the money in question.

[14] As said in *Colgin* v. *Henley*, 6 Leigh (33 Va.) at p. 94: "We must recollect that there is nothing technical * * in the word promise. It is a word in free and common use. I consider that any writing signed by A. and addressed or given to B., by which the writer declares his willingness, assent, or intention, to pay B. a certain sum of money, is a promise to pay that sum, whatever be the form of words in which it is clothed; * * * ."

The cases of *Stewart* v. *Reckless*, 24 N. J. Law (4 Zab.) 427-430, and *May* v. *West. Tel. Co.*, 112 Mass. 90-94, cited and relied on for the defendant, Loth, on this subject, are not in point. In the former decision, the expression referred to was merely of an intention to do a thing, not of an undertaking to do it, as in the cases before us. In the latter decision, the statement referred to was merely that the person making it was "authorized to do a certain act."

[15-19] As said in Williston on Contracts, sections 13, 22, 22a, 24 and 25:

"Section 13. * * An offer of reward, an offer of a price for goods or services, becomes a contract when

what is requested is given or done, though no obligation to give or to do anything ever exists."

"Section 22. It is customarily said that mutual assent is essential to the formulation of simple contracts, but it should be further stated that mutual assent must be expressed by one party to the other, and except as so expressed is immaterial. In some branches of the law, especially in the criminal law, a person's secret intent is important, but in the formation of contracts it was long ago settled that secret intent was immaterial. . * * * the fundamental basis of contract in the common law is reliance on outward act, (that of a promise) * *. The assent of the promisee to a unilateral contract may be indicated by an act requested by the promisor, but of which he has no knowledge unless he takes steps to inform himself; but a promise necessarily implies either communication from the promisor to the promisee, or at least some action which will indicate to the promisee the intent of the promisor."

"Section 22-a. *Assent may be expressed by acts.*— Though assent must be expressed to be legally effective, it need not be expressed by words. In the early law of assumpsit stress was laid on the necessity of a promise in terms, but the modern law rightly construes both acts and words as having the meaning which a reasonable person present would put upon them in view of the surrounding circumstances."

"Section 24. *Requirements of a promise.*—A promise from the very meaning of the word, involves an undertaking to do something in the future. * * The chief requirement is that the promise shall be sufficiently certain in its terms to enable the court to understand what the promisor undertakes. * *"

"Section 25. *An offer is a promise.*—An offer is a statement by the offerer that he will give a return for

some promise or act of the offeree. As the offeror's statement necessarily looks to the future, it must always be promissory in terms. It is sometimes assumed that an offer is something different in its nature from a promise and hence from a contract, but this is a mistake. An offer is always a conditional promise, and it may be a contract. * * * . An offer is to be known from other conditional promises only because the performance of the condition in an offer is requested as the exchange or return for the promise in the offer, thereby giving the offeree a power, by complying with the request, to turn the promise in the offer into a contract * *. The offer may be for the formation either of a bilateral contract or a unilateral contract. * * If the offer contemplates the formation of a unilateral contract, it may be that the offerer proposes to exchange his own promise for an act of the offeree. * *"

[20] When construed in the light of the surrounding circumstances shown in the evidence, we think that the first paragraphs of the letter of April 2nd, when the letter was sent to and received by the subcontractors and material men, was an offer on the part of Loth to pay them respectively for such material and labor as they had theretofore furnished for his building and such as they would thereafter furnish therefor, upon condition that they would allow Loth to receive and utilize the same in his building, in accordance with the contracts already and thereafter made therefor with the general contractor (and hence without any delay due to distrust of receiving payment therefor), and without assertion of mechanics' liens or litigation of any sort (which, too, would result in expense to Loth and delay in the completion of his building); and the performance of that condition on the part of those to whom the letter was sent was, under the circumstances, impliedly

and unmistakably requested by the terms of the letter, as the exchange for the promise contained in it. 1 Williston on Contracts, secs. 22-a and 112, at p. 233. No promise on the part of those to whom it was sent was requested by the letter, looking to a bilateral contract, which would have required an express acceptance on the part of the promisees of the offer contained in the letter. Merely the act of the offerees, respectively, consisting of furnishing the material and labor for the purpose aforesaid in accordance with their contracts made and to be made with the general contractor, and then allowing the owner of the building to receive and utilize the same, as aforesaid, and without the delay aforesaid, was expected. Nor was there any limit of time fixed by the letter within which the aforesaid act was to be performed, other than that it was to be in accordance with the contracts with the general contractor. Hence, as above said in substance, the aforesaid acts of the offerees, done with the intent to comply and in fact complying with all of the terms of the letter, turned the promise contained in the letter into the aforesaid contract obligation of the defendant, Loth.

[21, 22] 2. Was there sufficient consideration to support the aforesaid promise on the part of Loth to pay the aforesaid unpaid claims of the plaintiffs, other than Sitterding-Carneal-Davis Company, so as to render the promise enforceable?

The question must be answered in the affirmative.

Here again, we do not find it necessary to decide the very interesting question whether the promise is an original undertaking because upon new and valuable consideration, or a promise to pay the debt of another, since in either case it must have been supported by valuable consideration in order to be enforceable. Whether the promise falls within the one class or the

other of promises, it is plain, under the evidence, that as to all of the respective plaintiffs, other than Sitterding-Carneal-Davis Company, it was supported by valuable consideration.

[23] We do not understand that this conclusion is intended to be assailed by the argument for the defendant, Loth, if the conclusion we have reached, that the unconditional promise aforesaid was made, were conceded to be sound. We shall not, therefore, enter upon any extended consideration of the question now before us. We deem it sufficient to say on this subject that the situation disclosed by the evidence is different from where the promise is to pay the debt of another and the consideration moving from the promisee goes to another and not to the promisor; or where the consideration consists solely in the forbearance of the promisee to do something, whereby the promisor is benefited, or where the only consideration is that the promisee, on the faith of the promise, changes his *status quo ante* to his injury. In the cases before us, other than that involving the claim of Sitterding-Carneal-Davis Company, the promisor, Loth, received the consideration moving from the plaintiffs—and received it unincumbered at the time, and unincumbered later, until he refused to comply with his promise, by any lien, or claim of lien, or suit— which, but for the promise, would not have been the case, according to the preponderance of the evidence. The receipt by Loth of the material and labor thus unincumbered furnished to him by such plaintiffs because of the promise, constituted valuable consideration for the promise. In such case it is elementary that whether the consideration was commensurate with the promise is immaterial. If the consideration has any value whatever, it is, in such case, sufficient to support the promisee and render it enforceable.

Here was a benefit received by the promisee, at his request (since the furnishing of it was induced by his aforesaid letter), and a benefit moving from the promisee. This was in itself, regardless of any detriment to the promisee, or of anything else whatsoever, sufficient consideration to support the promise. 1 Williston on Contr., secs. 102, 114.  Moreover, it was an executed consideration.  The promisor received and accepted, in exchange for his promise, something which he was not previously entitled to receive.  Hence, it was also an adequate consideration to support the promise, "though it had been but a peppercorn."  *Idem*, secs. 102-a, 115.

As to all of the claims of the plaintiffs, except that of McMillan & Son, the labor and material was furnished to Loth, in whole or in part, after the letter, because of the aforesaid unconditional promise expressed in it. That was sufficient consideration to support the promise as to all of such plaintiffs.  As to the claim of McMillan & Son—the material was furnished before the letter was received by it; but it surrendered the material to Loth, unincumbered as aforesaid, after the letter was received, because of the aforesaid unconditional promise of the latter, as it established, as we think, by the preponderance of the evidence.

[24] 3.  Can this court consider the cross-assignment of error of the parties, Richmond Engineering and Manufacturing Company, and C. C. Pruden Company, who did not appeal from the decree under review, but are appellees, were served with or acknowledged the process of and are before this court as such, upon the appeal, and give such parties the benefit of the above holdings?

The question must be answered in the affirmative.

We think that this is apparent from the provisions of Rule VIII of this court, which, so far as material, is as follows:

"In any appeal    *    *    if error is perceived against

any appellee or defendant, the court will consider the whole record as before them, and will reverse the proceedings, either in whole or in part, in the same manner as they would do were the appellee or defendant to bring the same before them *  *  by appeal *  *."

It results from what we have said above that we are of opinion that the defendant, Loth, is personally liable to all of the plaintiffs, except Sitterding-Carneal-Davis Company. This result renders it unnecessary to deal with any of the other questions raised by the assignments and cross-assignments of error touching the claims of such plaintiffs.

We come now to deal with the material questions raised by the assignments of error affecting the claim of Sitterding-Carneal-Davis Company.

[25] 4. Did the institution of the first above entitled suit—which was not a general creditor's or a general creditor's lien suit, but had for its sole object the enforcement of the mechanic's lien and other alleged rights of the plaintiff in that suit, and to which Sitterding-Carneal-Davis Company was not made a party, and did not in any way become a party, until it filed its petition to enforce its mechanic's lien and other alleged rights, which was more than six months after the whole amount covered by the lien claimed became payable—suspend the running of the period in which the statute then in force (Pollard's Code 1904, section 2481), required suit to enforce any such lien to be brought?

The question must be answered in the negative.

The statute involved (Pollard's Code 1904, section 2481), is as follows:

"Section 2481. *Limitation of Lien.*—No suit to enforce any lien perfected under the six preceding sections of this chapter shall be brought after six months from the time when the whole amount covered by such lien

has become payable; provided, however, that the filing of a petition to enforce any such lien in any suit wherein such petition may be properly filed shall be regarded as the institution of a suit under this section."

*Spiller* v. *Wells*, 96 Va. 598, 32 S. E. 46, 70 Am. St. Rep. 878, and *Craig* v. *Hoge*, 95 Va. 275, 28 S. E. 317, are relied on in argument by counsel for Sitterding-Carneal-Davis Company as holding that the institution within the time required by said statute of a suit by any mechanic's lien holders in which the holders of other mechanic's liens might properly file their petitions to enforce their liens, stopped the running of the statute in question as to such other mechanic's liens. We do not think that these cases so hold. They, in substance, hold merely that the institution of such a suit confers upon the court in which it is brought, if that court has territorial jurisdiction, exclusive jurisdiction of the subject matter and of all of the parties before the court in such suit, and hence suspends, during the pendency thereof, the running of said statute of limitations as to any mechanic's lien, on the same property as that involved in such first brought suit, held by one who is a party before the court in such suit. The obstacle in the way of the plaintiff, whose claim is now under consideration, obtaining the benefit of the holding in the cases referred to, is that it was in no way a party to the original suit, which is relied on to stop the statute, until after the six months running of the statute was completed and such plaintiff's mechanic's lien was barred by the statute.

*Francis & Co.* v. *Hotel Rueger*, 125 Va. 106, 99 S. E. 690, is also relied on in argument as sustaining the position that the order of reference for an account of liens in a mechanic's lien suit stops the running of the statute on all mechanic's liens on the same property which is involved in the suit. But the holding in that case does

not sustain such position. In that case, Warren-Ehret Company's mechanic's lien was held to be barred by the statute, because that company was not a party to either of two suits brought by other mechanics' lien holders before the statute had barred its lien, and because another suit of the owner of the building to which it was a party was not brought until after the statute had barred its lien. There is a reference in the opinion of the court to the fact that it was also true that when the account of liens was ordered in the two suits first above mentioned the lien in question was barred, but that was merely an incidental circumstance, in no way influencing the decision.

5. Was there error in the decree under review in excluding the plaintiff, Sitterding-Carneal-Davis Company, from any participation in the distribution of the fund of $12,798.58 and interest thereon from January 9, 1914, mentioned in the decree?

We are unable to answer the question.

We have not been able to find in the record the facts bearing thereon sufficiently disclosed to enable us to decide what are the rights of this plaintiff with respect to the fund in question. We will express below as definite views as we can on the subject and remand the case for further proceedings in the court below, if necessary, not in conflict therewith.

[26, 27] The plaintiff whose claim is now under consideration, in substance, alleged in its petition, and has shown by its proof, that it furnished the material covered by its claim in reliance upon the construction which it gave to the letter of April 2, 1913, which was that the letter merely notified it of the existence of the *contract* of April 2nd, and that Loth undertook by the letter to pay it, as a subcontractor, as provided by the terms of such contract. Loth cannot object to this po-

sition as it is in accord with his answer to such petition and with his attempted proof. The position is that the acts of this plaintiff were not intended as an assent to and so in acceptance of a promise on the part of Loth to pay its claim without the limitation or condition imposed that the liability therefor should not go beyond the balance owing to the general contractor. As the acts were in themselves ambiguous, the actual intent was material, and, in such case, bars the plaintiff from establishing any other contract than that claimed in its petition. 1 Williston on Contracts, section 66. Therefore, since the court must in every case confine the decision to the issues made by the pleadings and established by the proof in the particular case, in so far as this plaintiff is concerned its rights with respect to participating in the distribution of the fund in question must be determined by the provisions of said contract, when applied to the material facts.

[28] With regard to the retention by Loth of a fund to meet the subcontractors and material men, there is in the contract of April 2nd this provision: "The amount which shall be held by the said F. P. Loth to meet such payments to be made to * * material men, as above set forth, shall be in such amounts and at such times, as shall become due and payable by the said F. P. Loth to said Richardson and Sons in accordance with the terms of said contract." The contract thus referred to is the agreement in writing between Loth and Richardson and Sons of date July 20, 1912. In that contract it is provided, with respect to the amounts and terms the money shall become due and payable to Richardson and Sons, as follows:

"Eighty-five (85) per cent. of work erected on the 15th of every month and the remainder when building has been completed according to plans and specifications and accepted by owner and architect.

"Provided that in each of said cases a certificate shall be obtained and signed by the architects."

We think that the other provisions in the *contract* of April 2nd with reference to designating the material men and determining the amounts to be paid them, by "J. A. Johnston," have reference to his action as one of the "architects" referred to in the contract of July 20, 1912; and that he was given no arbitrary right to designate to whom or what amounts were to be paid under the contract of April 2nd. Hence the last sentence of the contract of 1912 above quoted is changed by the April 2nd contract so that for the words therein "signed by the architects," should be read "signed by J. A. Johnston, as architect." As thus modified the aforesaid provisions of the July 20, 1912, contract and all of the provisions of the April 2, 1913, contract, when read together, fix the rights of the plaintiff Sitterding-Carneal-Davis Company to participate in the distribution of the fund in question.

[29] The effect of the provisions of the two contracts of April 2, 1913, and July 30, 1912, was that the rights of the respective subcontractors and material men to share in the distribution of the money due from Loth to the general contractor after April 2, 1913, accrued, respectively, following the incorporation of their labor and material into the work erected, at the times they, respectively, obtained J. A. Johnston's certificate as architect, or, were entitled to receive such certificate, and *to the extent* of eighty-five per cent. of the amounts covered, or which would have been covered by such architect's certificates; the remaining fifteen per cent. thereof not becoming due and payable until the building was completed, which was January 9, 1914, according to the report of said master commissioner.

Now it appears from the evidence that on October

24, 1913, Sitterding-Carneal-Davis Company obtained from the general contractors approval of such plaintiff's claim to the extent of $3,073.69. Whether the certificate, or certificates, of the architect, J. A. Johnston, in favor thereof had then been obtained, or was or were entitled to be obtained, we do not find disclosed by the record. Whenever such certificate, or certificates, for any part of the claim, was or were obtained or entitled to be obtained, such plaintiff's right to participate in the distribution of such balance of the money, then still owing to the general contractor, became fixed, to the extent of payment of eighty-five per cent. of the amounts then owing to it as aforesaid, and the residue of fifteen per cent. thereof would not have become payable until the completion of the building, January 9, 1914, but should have been then set aside, as will be hereinafter stated.

To ascertain the balance of money still owing to the general contractor, as of the time the right of the plaintiff, Sitterding-Carneal-Davis Company, to participate in the distribution thereof became fixed, the whole of all of the claims of other subcontractors and material men entitled, as aforesaid, under the provisions of the contracts of April 2, 1913, and July 20, 1912, to have been paid prior to such time, unpaid as well as actually paid at such time, should have been deducted from the total amount which had accrued up to that time as owing to the general contractor from Loth, and fifteen per cent. of such total should be treated as set aside as the reserve percentage under said April 2nd contract and the clause of the 1912 contract aforesaid incorporated therein, to await the completion of the building.

In the distribution of the balance thus ascertained, if there was any such balance, the plaintiff, Sitterding-Carneal-Davis Company, was entitled to participate pro rata to the extent of eighty-five per cent. of the said fixed

amounts of its claim along with eighty-five per cent. of the claims of all other subcontractors and material men which had not been paid or were not entitled to be paid as aforesaid prior thereto, but which were or would have been then covered by J. A. Johnston's certificates as architect obtained, or entitled to be obtained as aforesaid, if any such claims there were; and if there was none such other claim, Sitterding-Carneal-Davis Company was entitled to be paid the eighty-five per cent. of the said fixed amounts of its claim as of the time or times the amount or amounts became fixed in right to distribution as aforesaid, if the balance available therefor was sufficient; and to have the fifteen per cent. residue of such amount or amounts then set aside and reserved until the building was completed, if there was then available sufficient balance therefor.

Out of the balance then remaining, if any, exclusive of the total of the fifteen per cent. on all the aforesaid prior claims, which should be treated as set aside as aforesaid, the claims of other subcontractors and material men, if any, which subsequently and up. to the completion of the building became entitled to have their rights fixed to share in such balance under the contract provisions aforesaid, in the same method as that outlined above as applicable to the Sitterding-Carneal-Davis Company claim, should be treated as having been paid from time to time as they became entitled to their said eighty-five per cent. and to have their fifteen per cent. reserve percentage similarly set aside, as aforesaid.

If, when Sitterding-Carneal-Davis Company's right to participate in the distribution to any extent became fixed, as aforesaid, there was any balance of funds applicable to its claim, or any part thereof, then as of January 9, 1914, it should be considered that there was a final balance, including the total of all the fifteen per cent. re-

served percentages, which should have been reserved and set aside as aforesaid, since April 2, 1913, including Sitterding-Carneal-Davis Company's said fifteen per cent.; and the further amount, which such plaintiff should receive should be ascertained by calculating what the share of the reserved fifteen per cent. of the amount of such plaintiff's claim fixed in right of distribution, as aforesaid, would be in such final balance, in a pro rata division of such balance between it and the total of all the other fifteen per cent. reserved percentages aforesaid.

It will be seen from what is said above that whether there was any error in the decree under review in not allowing the Sitterding-Carneal-Davis Company claim to participate in the distribution in question will depend on whether claims prior in right aggregated such a total before any part of such plaintiff's claim became fixed in right to share in the distribution that no balance of the fund was then left. If that was the case, there is no error in the decree on the subject under consideration. If that was not the case and there was some balance left in which such plaintiff had some right to share, as aforesaid, there was error in the decree, and such plaintiff's rights to share in the distribution must be worked out along the lines indicated above.

[30] Further: If by any breach of the aforesaid contract provisions by the said Loth, Sitterding-Carneal-Davis Company has been defeated of any rights as they are above defined by reason of the actual fund aforesaid not being of sufficient amount to satisfy the shares of money to which such plaintiff is entitled in accordance with the views above expressed, then we are of opinion that the defendant, Loth, is personally liable to such plaintiffs to such extent.

The decree under review will be reversed and decree of this court will be entered against the defend-

ant, Loth, in favor of all of the plaintiffs aforesaid, except Sitterding-Carneal-Davis Company, for full amounts of the balances of their claims, respectively, to-wit: in favor of Richmond Engineering and Manufacturing Company for $2,944.53 with interest thereon from November 1, 1913, until paid; Guilford Marble and Tile Company for $4,614.80, with interest thereon from December 31, 1913, until paid; Norfolk Iron and Wire Works, Inc., $1,879.37, with interest thereon from January 14, 1914, until paid; Hammett Fire Proofing Company, $3,500.33, with interest thereon from December 14, 1913, until paid; Wm. A. Burchard Company, Inc., $1,185.03 with interest thereon from December 1, 1913, until paid; C. D. Pruden Company, $734.00, with interest thereon from January 1, 1914, until paid; W. F. Mahoney, $2,457.32, with interest thereon from January 14, 1914, until paid; and W. McMillan & Son, $2,265.94, with interest thereon from May 1, 1913, until paid; together with costs in this court and in the court below.   And the cause of *Sitterding-Carneal-Davis Co.* v. *F. P. Loth* will be remanded to the court below for such further proceedings therein as may be necessary not in conflict with the views above expressed in this opinion, without any allowance of costs to such plaintiff.

> *Reversed; final decree entered in favor of all of the plaintiffs except Sitterding-Carneal-Davis Company, and the cause of that plaintiff remanded for further proceedings.*