## Wytheville

### NORFOLK MATTRESS COMPANY, INCORPORATED v. ROYAL MANUFACTURING COMPANY, INCORPORATED.

June 15, 1933.

Present, Campbell, C. J., and Holt, Epes, Hudgins and Gregory, JJ.

The opinion states the case.

*Brandt & Ehrenworth*, for the plaintiff in error.

*James E. Heath* and *Alan J. Hofheimer*, for the defendant in error.

HOLT, J., delivered the opinion of the court.

This is an action on a guaranty made by the Norfolk Mattress Company, Incorporated, to the Royal Manufacturing Company, Incorporated, under which it stood for the performance of a contract between it and Cotton Products Corporation. The Royal Manufacturing Company did busi-

ness from Charlotte, North Carolina. The other two corporations were Norfolk concerns. There was a verdict and judgment against the defendant in the sum of $5,423.43, which we, on familiar principles, should sustain unless clearly erroneous.

This contract bears date March 13, 1930. The guaranty was by word of mouth, and was confirmed later by a letter of April 2, 1930, in which the mattress company, speaking through its vice-president and treasurer, said:

"I am also very glad to confirm the conversation you had with Mr. Myers and the writer, and I herewith guarantee the sale number 1692 contract to the Cotton Products Corporation of Norfolk, Virginia, the payment of this contract."

The mattress company had this charter power: "The corporation shall have the power to subscribe to, purchase, or otherwise acquire, or to guarantee, or to become surety, in respect to the stocks, bonds or other securities and obligations of other companies."

It made mattresses from cotton products. S. E. Myers was its president, and Warwick Mayo was its vice-president and treasurer. These two gentlemen owned all of its stock.

Mayo was president of Cotton Products Corporation. J. B. Hecht was vice-president and secretary, and Myers treasurer. They held in equal parts its entire capital stock of $20,000. Originally a Mr. Saunders was interested but he found himself unable to pay his stock subscription and was dropped. It went into bankruptcy in July, 1931.

The Royal Manufacturing Company, Incorporated, held certain patents for the cleaning of a form of cotton lint known as "motes," and which were suited for mattress making.

This statement is taken from the petition for a writ of error: "A short time prior to the 20th day of November, 1929, one J. C. Saunders, of Bainbridge, Georgia, interested a Mr. J. B. Hecht, of the city of Norfolk, Virginia, in a certain machine invented by the said Saunders, and used in the refinement of cotton motes. Mr. Hecht in turn discussed

the matter with Messrs. Warwick Mayo and Sylvan E. Myers, residents of the city of Norfolk, with the view of organizing a corporation to manufacture and sell the refined motes produced by the machine invented by Saunders. On the 20th day of November, 1929, a written agreement was entered into between the said J. C. Saunders, Hecht, Mayo and Myers, by the terms of which it was agreed that a corporation was to be organized, which corporation was to engage in the business of making sale of such refined product, each of the four parties to subscribe and pay for one-fourth of the capital stock of such proposed corporation.

"Pursuant to this agreement, on the 20th day of December, 1929, a corporation was formed known as Cotton Products Corporation, the incorporators and officers being Warwick Mayo, president; James C. Saunders, vice-president; Sylvan E. Myers, treasurer; and J. B. Hecht, secretary. Mr. Saunders was unable to make payment for the stock subscribed by him, and thereupon the three remaining parties completed the organization of the said corporation, each of said parties subscribing and paying for one-third of the capital stock of the corporation in cash, the total amount of which capital stock amounted to twenty thousand ($20,000.00) dollars."

Mr. I. A. Stone, vice-president of the Royal Manufacturing Company came to Norfolk at the invitation of the Norfolk Mattress Company for a conference and did confer with Mayo, Myers and Hecht. He tells us what took place.

"It was a rather protracted discussion. I will state the germane part of it. The gentleman in question dignified me by asking the process of manufacturing some merchandise which they intended to use in the major part of their own business in the Norfolk Mattress Company, and also stated that they would like to confine the purchase of raw material to one substantial organization so that they would not stir up the market by purchasing in connection with it and bid against themselves and go broadcast to buy these large quantities of materials. They also asked my reaction in

regard to this particular process of refining. I gave them my advices which were negative and they explained to me that inasmuch as this happened to be a unique process of some kind for refining these motes and further inasmuch as they were in position themselves to take a large bulk of the output of Cotton Products Corporation that they would be in a different position than if they were selling in the open market to Tom, Dick and Harry.

\*      \*      \*      \*      \*      \*   .   \*

"At the time of the interview with Mr. Myers and Mr. Mayo and Mr. Hecht, the question of credit came up during the discussion because they spoke of special quantities of merchandise which they were going to use, and I didn't know anything about Cotton Products Corporation and I didn't know anything about the financial set-up of it and the financial responsibility of it, and I inquired from the three gentlemen, particularly I think from Messrs. Myers and Mayo, whom I had known before and favorably, and they said that they would have to go to work and discuss the set-up of Cotton Products Corporation because it was not actually set up in its final set-up and in due process of time they would submit a statement. I told them the only way that we could go to work and sell them substantial sums was by the guaranty of Norfolk Mattress Company, which they said that they would cheerfully give."

On April 2, 1930, the mattress company wrote to the Carolina company, and in part said: "I have your letter of March 31st, and in reply to the first part of your letter, we are not in a position at this time to place any contracts for Fly for use in the Norfolk Mattress Company factory. We are looking forward to our new plant supplying us with better stocks which will be all clean. Of course, at this time we cannot say whether we will be able to depend on them for our entire needs. Nevertheless, in the next week or two we will, and I will be very glad to get in touch with you if there is anything we might need. Nevertheless, whether we are buying for the Norfolk Mattress Company

or not it will be all the same, as I am sure the Cotton Products Corporation will be a position to place a tremendous lot business with you. * * *

"However we look forward to your cooperation with us, and particularly with the Norfolk Mattress Company's guarantee of any shipments you make on this contract."

"Our new plant," referred to in this letter of the mattress company was that of Cotton Products Corporation. This latter company, as a physical plant, was under the management of Mr. Hecht, but Mr. Myers and Mr. Mayo, its president and treasurer, and majority stockholders, were there several times each week and were of course cognizant of all that went on. Motes were furnished by the North Carolina company to the products corporation, processed and sold to the mattress company in large quantities. That the products corporation was operated as a feeder for the mattress company is too plain for argument. It made possible the purchase of materials suitable for mattresses in a closed market—not only closed, but controlled by two men who both owned and operated the mattress company. The purpose, as Stone has stated, was that "they would not stir up the market by purchasing in connection with it and bid against themselves."

Was this an *ultra vires* contract? It was not.

A corporation, unless authorized by its charter, cannot lend its credit, but it may use that credit for its own protection and security. *Norton Grocery Co.* v. *People's National Bank,* 151 Va. 195, 144 S. E. 501.

"A corporation dealing in manufactured goods, and needing them for sale, may, as a proper incident to its business, extend financial aid to a manufacturer by advancing him money to enable him to furnish the goods. This aid may be extended by a loan of its own money, or it may take his notes, and by its credit raise money thereon, and advance such money, looking for reimbursement out of goods to be manufactured and delivered to it." *Holmes* v. *Willard,* 125 N. Y. 75, 81, 25 N. E. 1083, 1084, 11 L. R. A. 170.

To the same effect see *Whitehead* v. *American Lamp & Brass Co.*, 70 N. J. Eq. 581, 62 Atl. 554. This principle plainly is applicable to the case in judgment, and distinguishes it from *Foods Products Co.* v. *Pierce*, 154 Va. 74, 152 S. E. 562. It was there held that a corporate accommodation endorsement authorized neither by statute nor by charter is *ultra vires;* a corporation cannot lend its credit to a stranger.

To this salutary rule we adhere, for one who becomes a stockholder should be required to assume only those hazards incident to the business. It may be on other grounds distinguished from the *Foods Products Case.* There were three stockholders, one of whom refused to ratify the endorsement. In this case there are two stockholders, both of whom approve of all that was done, and so no undue hazards are visited upon others. *Moore* v. *Aetna Co.*, 155 Va. 556, 155 S. E. 707.

Our conclusions on this branch of the case in judgment are that this guaranty of the obligations of another company was primarily made for the guarantor's own benefit, and whether made for its benefit or not it has been ratified and approved by all of the stockholders.

It is said that the contract has been changed and the surety thereby released. It provided for the delivery of from 75,000 to 100,000 pounds of motes for the months of March and April, and from 50,000 to 75,000 pounds of motes from May to December. These are the deliveries actually made and accepted:

| | Weight |
|---|---|
| March | 108,872 |
| April | 60,277 |
| May | 193,099 |
| June | 38,820 |
| July | 10,562 |
| August | 37,597 |
| September | 35,833 |
| October | 154,188 |
| November | 81,139 |
| December | 22,513 |
| | 742,900 |

During this period the seller, at its option, had the right to deliver 800,000 pounds of this material. Less was delivered than might have been delivered. These variations in monthly deliveries, now relied upon as cancelling the contract of suretyship, were made at the request of and for the convenience of the purchaser. There was no new contract made and no binding agreement entered upon. *Livermon* v. *Lloyd,* 155 Va. 940, 157 S. E. 146; *Carson* v. *Mott Iron Works,* 117 Va. 24, 84 S. E. 12; *Atlantic Trust Co.* v. *Union Trust Corp.,* 110 Va. 286, 67 S. E. 182, 135 Am. St. Rep. 937; Brandt on Suretyship (3d ed.), page 814.

■ But it is not necessary that this case turn upon the execution or non-execution of a new contract. Mayo and Myers were the mattress company. They owned all of its stock and were its executive officers. They owned two-thirds of the stock of the Cotton Products Corporation and were its president and treasurer, respectively. They were in constant touch with the situation at the products corporation's plant, and in constant touch with the quantities and qualities of motes shipped to and accepted by it. That is to say, it appears beyond peradventure that the mattress company knew and acquiesced in everything that was done. 50 Corpus Juris, pages 122, 123. Indeed the May shipment of 193,099 pounds was made at the express request of Mr. Mayo. In these circumstances the mattress company is estopped to complain of monthly variations in quantity shipped and accepted, the aggregate of which was, as we have seen, less than that provided for in the contract of guaranty.

■ These contracts, when purely voluntary and without profit or advantage to the guarantor, must be strictly construed. Brandt on Suretyship (3d ed.), section 416. But this principle has no application in those cases in which the guarantor binds itself for its own advancement or for a valuable consideration. *Richmond Engineering Corporation* v. *Loth,* 135 Va. 110, 115 S. E. 774; *Luck & Sons, Inc.* v. *Boatwright,* 157 Va. 490, 162 S. E. 53.

The products corporation failed to pay for 289,746 pounds

of motes.  A judgment for the amount due on account of this failure was obtained, with the result that the purchaser was adjudicated a bankrupt with no dividends to creditors. The judgment here, with certain inconsequential changes, is for this claim which the seller has sought in vain to collect from the buyer.

It is said that in any event a credit of $737.54 should have been allowed.  Under the contract sued upon and known in the record as contract number 1692, motes were sold at two cents a pound.  There was another contract between the Royal Manufacturing Company and the Cotton Products Corporation, known as contract number 1821, under which a superior grade of cotton lint, or motes, was sold at the price of two and one-fourth cents a pound.  This second contract was not guaranteed, and it is said that the guarantor cannot be held liable for anything done under it; that cotton shipped under the second contract to the value of the sum of $737.54 has been improperly transferred to the first contract and so improperly charged against the guarantor.  Some shipments made under the first contract were rejected as not coming up to sample.  It was claimed that shipments under the second contract did not come up to sample either.  The buyer refused to pay two and one-fourth cents for these second contract shipments, but transferred the cotton to the first contract under which it was to pay only two cents.  This the Royal Manufacturing Company was unable to prevent, unless possibly by expensive litigation.  It is perfectly plain that had this cotton been shipped back to Charlotte, it could have been reshipped to Norfolk under contract number 1692.  Such a roundabout proceeding would have been wholly unnecessary.  It was transferred to and accepted under the first contract.  Moreover, it was done with the knowledge and acquiescence of Mayo and Myers, which, as we have seen, was with the knowledge and acquiescence of the mattress company.

Sundry exceptions are taken to instructions.  They are in

accord with the conclusions which we have reached, and in them we find no substantial error.

The guaranty was not *ultra vires.* It was not for the accommodation of the products corporation, but was primarily for the advancement of the interest of the guarantor, and was ratified by all of its stockholders.

Such changes as were made in monthly deliveries were made with its full knowledge and acquiescence—we might, for reasons heretofore stated, say, made at its instance. Deliveries did not exceed the amount guaranteed. Transfers of material from contract number 1821 to contract number 1692 were made without voluntary consent of the vendor and made with the knowledge and acquiescence of the guarantor; that is to say, made also with the knowledge of all of its stockholders and all of its executive officers, and made by a corporation which they controlled.

There is no error in the judgment complained of, and it is affirmed.

*Affirmed.*