INTERNATIONAL MINERALS & CHEM-
ICAL CORPORATION, Plaintiff-
Appellee,

v.

Monroe C. YAGER and Edith Yager,
Defendants-Appellants,

and

Rainbow Farm Service, Inc., and Tru-
man Sawyer, Defendants.

No. 72–1873.

United States Court of Appeals,
Seventh Circuit.

Sept. 23, 1974.

Robert W. Adams, George R. Glass, Shelbyville, Ind., Wilson S. Stober, Indianapolis, Ind., for defendants-appellants.

Charles T. Gleason and William J. Wood, Indianapolis, Ind., for plaintiff-appellee.

Before SWYGERT, Chief Judge, HASTINGS, and O'SULLIVAN,* Senior Circuit Judges.

O'SULLIVAN, Senior Circuit Judge.

Appellants Monroe C. Yager and Edith Yager, husband and wife, appeal from a judgment whereby they were held liable, as guarantors, for the indebtedness of Rainbow Farm Service, Inc., (Rainbow) to the plaintiff International Minerals and Chemical Corporation (IMC) for goods sold and delivered by IMC to Rainbow on open account. The case was tried to a District Judge in the United States District Court for the Southern District of Indiana who awarded judgment to plaintiff IMC against the Yagers in the amount of $93,009.43—the open account indebtedness of Rainbow to IMC—and $8,500 for attorney fees.

We reverse.

IMC is a New York corporation with its principal place of business in Skokie,

---

* Senior Circuit Judge Clifford O'Sullivan of the Sixth Circuit, sitting by designation.

Illinois. It is engaged primarily in selling at wholesale, fertilizer and other farm-related products, and also leases equipment to its retail customers. Rainbow is an Indiana corporation with offices in Shelbyville, Indiana. It was engaged in retail sale of fertilizer and other farm-related products. Rainbow was owned equally by a Truman Sawyer, its president, and the Yagers. Although defendant Monroe Yager was secretary of the corporation, he apparently took no active part in conducting its business; its operations were controlled primarily by Truman Sawyer.

Rainbow ceased making payments to IMC on April 26, 1970, and subsequently became insolvent. The present suit was started on September 8, 1970, against Rainbow for the debt owed to IMC, and against Truman Sawyer, Monroe Yager and Edith Yager as alleged guarantors of Rainbow's debt. Truman Sawyer died during the pendency of the action, and no personal representative was substituted for him or made a party to the action. Judgment was entered only against Rainbow and the Yagers.

Throughout the period from 1966 to 1970, Rainbow purchased fertilizer and other goods and leased equipment from IMC. On February 21, 1967, IMC and Rainbow entered into an agreement, styled an "Agent's Contract," whereby IMC was to consign fertilizer to Rainbow. The first paragraph of this form agreement reads:

"*We hereby appoint you an agent for the sale, on commission and for our account,* of such quantities and brands of Fertilizers as may be mutually agreed upon from time to time on the following terms and subject to the conditions hereinafter mentioned, and *you hereby accept the appointment* and agree to comply with all the terms and to perform all the conditions hereof." (Emphasis supplied.)

The remainder of the agreement detailed such items as: prices, commissions and discounts; storage and freight; record keeping; and duration of the agreement. Clause 9 provided that Rainbow would remit proceeds from the sales of fertilizer promptly to IMC, and that such funds were to be kept separate by Rainbow. In addition, the fertilizer was to remain the property of IMC until it was sold by Rainbow. The agreement was signed by Truman Sawyer, as representative of Rainbow.

On the same day that Rainbow entered into the Agent's Contract, the Yagers and Sawyer signed a Guaranty Agreement under which they guaranteed to IMC,

"the full, prompt, faithful and complete performance of all agreements contained in the contract appearing on the reverse side of this sheet [the Agent's Contract] and hereby further guarantee to said [IMC] or assigns, the prompt payment at maturity, or any time thereafter, of all accounts receivable, acceptances and notes given or taken in connection with *sales made under said contract* [Agent's Contract] . . . ." (Emphasis supplied.)

The agreement further provided that:

"This is an absolute and continuing guaranty and any indulgences, renewals, extensions, substitutions or variations in accounting or settlement or changes in price hereafter permitted or agreed upon by the parties to said contract shall not release us as guarantor(s) . . . ."

The Yagers signed this guaranty at the request of IMC's sales representative, but received no compensation therefrom.

Although the Agent's Contract and Guaranty covered consignments by IMC to Rainbow, the District Court found, and the parties do not dispute the fact, that all sales, both prior to and after entering the agreement, were not done on a consignment basis. Instead, IMC provided Rainbow fertilizer on open account, and both parties treated such transactions as ordinary sales. Rainbow owned the fertilizer upon delivery by IMC and also bore the risk of

price fluctuation in the fertilizer market. The Agent's Contract was restricted to consignments of fertilizer, but IMC sold both fertilizer and other farm-related products and also leased equipment to Rainbow.

It will seem at once that the Agent's Contract upon which the involved guaranty was endorsed was never employed in the dealings between IMC and Rainbow. At no time did Rainbow act as "agent for the sale, on commission and for our [IMC] account."

The indebtedness for which IMC was given judgment did not arise under either the 1967 Agent's Contract or under another contract made in 1968, called the Transfer Agreement. This latter agreement recited in its first paragraph:

> "The company [IMC] has appointed the Contractor [Rainbow] as its special *sales agent and consignee* to sell fertilizer and fertilizer materials * * * of the Company in the following territory." (Emphasis supplied.)

IMC's Indianapolis office manager, who also had the title of Field Accountant, and IMC sales representative for the area involved testified for IMC. Neither of them, however, explained why the business actually transacted with Rainbow was done on a basis in no way covered by the 1967 Agent's Contract or the 1968 Transfer Agreement. The District Judge recognized this in his opinion:

> "Despite the provisions of the agency contract, the undisputed evidence in this case has established that the transactions between IMC and Rainbow were never conducted on a consignment basis. Instead, IMC supplied Rainbow with fertilizer on open account and each party treated these transfers as sales by IMC to Rainbow, passing ownership of the fertilizer to Rainbow. Rainbow, thus, bore all the risks of fluctuations in the fertilizer market as to the fertilizer which it ordered from IMC and which was in its possession."

The District Judge, however, found reason to impose liability on the Yagers by holding that the method of doing business between IMC and Rainbow—sale and purchase on open account—was but an *alteration* of the Agent's Contract of February 1967, and that the Yagers consented to such alteration thereby keeping alive their guaranty. We disagree.

Rainbow never acted as a "special sales agent or consignee" of IMC; no business was ever carried on under the Agent's Contract of 1967; and no indebtedness of Rainbow to IMC ever arose thereunder. Although the District Judge recognized this fact, as evidenced in the above excerpt from his opinion, he found liability in the Yagers by holding that their conduct amounted to consent to what he considered an *alteration* of the 1967 Agent's Contract. He said:

> "11. Defendants Truman Sawyer, Monroe Yager, and Edith Yager had full knowledge of the *alterations* in the method of performance of defendant Rainbow Farm Service, Inc.'s obligations from that originally contemplated by the agency contract which they guaranteed.
>
> "12. Defendants Truman Sawyer, Monroe Yager and Edith Yager consented to said *alterations* in the obligations of Rainbow Farm Service, Inc., from those originally contemplated by the agency contract." (Emphasis supplied.)

Respectfully, we observe that there is no testimonial support for the District Judge's controlling findings. The evidence disclosed that from the beginning of their relationship the only method of doing business between IMC and Rainbow was on a buy and sell—open account—basis. This was true from 1966 through 1967, and 1968—the years during which the Agent's Contract of February 21, 1967, and the Transfer Agreement of October 30, 1968, were executed. Neither of these contracts ever attained viability in the business relations of IMC and Rainbow.

At trial, IMC's quite meager testimony, provided by its Indianapolis office manager and its sales representative who handled the Rainbow account, failed to explain why the agency contracts of 1967 and 1968 were executed but never used. Thomas Nelson, the sales representative for IMC from 1965 to 1970 in the territory where Rainbow was located, confirmed the testimony of Monroe Yager, discussed below, that all of his dealings for IMC were with the deceased Truman Sawyer. The following portrays this:

"Q. As far as you know, Mr. Yager had no experience in the fertilizer business; is that correct?

"A. This is correct.

"Q. But Truman Sawyer did?

"A. Yes.

"Q. He had been in it for some time?

"A. Yes."

This witness also said:

"Q. Mr. Nelson, you did not deal with Mr. or Mrs. Yager in the fertilizer sales at any time, did you?

"A. No.

"Q. Your only contact was with Mr. Sawyer?

"A. Yes, sir.

"Q. So Mr. Yager, as far as you know, did not know the negotiations going on between you and Mr. Sawyer?

"A. No."

As to his signing of the guaranty agreement, Monroe Yager testified that the document was brought to him by Nelson when Yager was in the hospital undergoing major abodominal surgery. Asked about the circumstances of the execution of the guaranty by Yager, the witness Nelson answered, "to specifically recall, I can't. * * * I don't actually remember this thing."

At the times here involved, Monroe Yager was principally engaged in farming. He had gone to the fifth grade in school. Yager also owned a wholesale beer distributorship the size of which was not disclosed. While Yager and his wife owned half of the stock of Rainbow, he left Sawyer to run the business. Yager's position as Secretary was formal and did not involve him in running the corporate affairs. He identified his signature on the guaranty and said that, without any explanation of its effect, and without reading it, he signed the guaranty at the request of Nelson. The latter did not challenge this testimony. Monroe Yager's wife, Edith Yager, was not called as a witness and nothing of the circumstances of her signing the guaranty was given. The evidence also showed that while the Yagers owned 50% of the stock of Rainbow, they received no salary, dividends or other compensation from Rainbow.

The District Judge set out the applicable rule of law under which the Yagers could be held liable for an indebtedness, as follows:

"In determining whether there has been a material alteration, a contract of guaranty is to be construed according to the intention of the parties as ascertained from the instrument read in light of the surrounding circumstances. Will[s] v. Ross, 77 Ind. 1 (1881); Hernly [Hernley] v. Brannum, 23 Ind.App. 388, 55 N.E. 512 (1899). Despite the fact that, in the instant case, the conduct of IMC and Rainbow casts doubt upon whether they ever intended to conduct their transaction on a consignment basis, the language of the contract clearly does not provide for the sale of fertilizer by IMC to Rainbow on open account. Thus, unless defendants Truman Sawyer, Monroe Yager and Edith Yager consented to this *alteration* from the method of performance of Rainbow's obligations, as contemplated in the original agreement, [the Agent's Contract of 1967] they should be discharged from their contract of guaranty. See 38 C.J.S. [Guaranty] § 72, note 35, at 1238." (Emphasis supplied.)

This paragraph is a correct statement of the law. He went on, however, to find a way to apply the guaranty to the Yagers. His opinion sets out:

"It must be noted, however, that Truman Sawyer and Monroe Yager, as officers and stockholders, were in complete control of Rainbow. Sawyer was the President of Rainbow and Monroe Yager was the Secretary, (see Defendant's Exhibit B) and they each owned 50 percent of Rainbow's stock. In view of the fact that Sawyer, Monroe Yager and Edith Yager all signed the contract of guaranty and that Sawyer and Monroe Yager were in complete control of Rainbow during the periods of time in question, the Court concludes that all of the guarantors had full knowledge of the aforementioned *alterations* in the method of performance of Rainbow's obligations from that contemplated in the agency contract and that the guarantors consented to those *alterations*. See: Norfolk Mattress Co. Inc. v. Royal Mfg. Co., Inc., 160 Va. 623, 169 S.E. 586 (1933); Andrew v. Austin, 213 Iowa 963, 232 N.W. 79 (1930). The consent necessary to continue the guarantor's liability need not be made the subject of a formal contract. Knoebel v. Kircher, 33 Ill. 308." (Emphasis supplied.)

■■ The District Judge recited applicable law. However, his finding that the open account dealing was but an *alteration* of the contract of 1967 and that such *alteration* was made with the knowledge and consent of the Yagers was without support in the evidence. We consider, and hold, that the District Judge's factual findings, discussed above, were clearly erroneous within the contemplation of Rule 52(a) Fed.R.Civ. P. The award of an attorney fee of $8,500 must also be set aside. Such allowance was based on a clause in the 1967 agreement which never came into being.

We reverse and remand for entry of judgment dismissing the complaint as to appellants Monroe Yager and Edith Yager.